THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SELDON J. SWARTWOUT, Defendant-Appellant.

Second District    No. 2—98—0684

Opinion filed January 28, 2000.

G. Joseph Weller and Paul Alexander Rogers, both of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Sally A. Swiss, of Wheaton, for the People.

JUSTICE HUTCHINSON delivered the opinion of the court:

Following a jury trial, defendant, Seldon Swartwout, was found guilty of criminal housing management (720 ILCS 5/12—5.1 (West 1996)) and sentenced to two years' conditional discharge. Defendant appeals, contending that (1) the charging instrument was insufficient because it failed to specify the acts that constituted the offense; (2) he was not proved guilty beyond a reasonable doubt; and (3) the trial court erred when it instructed the jury on its definition of "residence." We affirm.

The charges in this case arise from defendant's ownership of a house on Lincoln Park Boulevard in Rockford. The State alleged that defendant booby-trapped his home by attaching rat traps to the door jambs of the house near the door knobs and hiding rat traps on the floor. The State also alleged that defendant created a trap using chainsaw blades, or, more accurately, the chains from chainsaw blades, by stretching one chain across the pathway in the house at shin level and a second chain across the same pathway behind the first near neck level. Defendant does not dispute the factual substance of these allegations on appeal.

On July 7, 1997, defendant was charged by a criminal complaint that alleged that on April 24, 1997, defendant had control of a house located in Rockford and recklessly allowed the physical condition of the house to remain in a condition that endangered any person. On August 7, 1997, defendant filed a motion for discovery and a motion for a bill of particulars. In his motion for a bill of particulars, defendant asked the State to identify, *inter alia*, the physical conditions of the property that endangered the safety of any person and the specific criminal acts the State sought to prove at trial. The trial court entered no written order in response to the motion for a bill of particulars, and the record on appeal contains neither a written response to defendant's motions nor a report of proceedings for a hearing on these motions.

On April 28, 1998, defendant filed a motion to dismiss and three motions *in limine*. The motion to dismiss contended that the complaint failed to allege sufficient facts to constitute an offense. The first motion *in limine* sought to exclude evidence of defendant's prior

convictions for various health code and traffic violations. The second motion *in limine* sought to exclude evidence of rat traps and chainsaw traps and alleged that, "based upon discovery received to date, it is believed the State intends to present into evidence testimony regarding testimony of physical evidence of rat traps or chainsaw traps." The third motion *in limine* sought to exclude evidence of bombs, bomb squad investigations, and searches.

The trial court ruled that the State's bomb disposal witness could testify that he was trained to dispose of bombs but should describe his actions as a search for dangerous devices. Defendant argued that the evidence of rat traps should be excluded because the criminal housing management statute did not apply outside of a landlord-tenant relationship. The trial court ruled that the plain language of the statute did not contain such a limitation and denied defendant's motion to exclude evidence of the rat traps. The court finally ruled that the State could not elicit testimony regarding defendant's prior convictions, but the trial court would allow evidence that defendant had prior contact with the health department to establish the nature of his relationship with the State's witness from the health department.

At trial, Sergeant Paul DeNard testified that he was an explosive ordnance disposal technician in the Unites States Army stationed at Fort McCoy. On April 24, 1997, he was dispatched to 207 Lincoln Park Boulevard in Rockford. When he arrived he examined the area for hazardous devices and decided to use a remote-controlled robot to enter the house. DeNard attempted to maneuver the robot through a screen door into the house but discovered that the path was blocked by garbage. The robot broke the door jamb and sprang a rat trap that was attached to the jamb. DeNard decided to enter the house himself and donned a protective suit. As he approached the front door, he found a piece of plastic covering the window. He pulled the plastic back and discovered a rat trap inside the building next to the lock. DeNard determined that the trap was not attached to anything else and sprang the trap. DeNard discovered several more rat traps on the floor in the house, one of which was hidden by a plastic bag. DeNard continued into the house and encountered two chainsaw chains. DeNard testified that one chain was stretched across the pathway at shin or knee height and the other was positioned at face level, held taut by a bungee cord.

Suzanne Dobson testified that she was a supervisor at the Winnebago County Health Department. Dobson testified that defendant owned the property at 207 Lincoln Park Boulevard. Dobson had dealt with defendant for the past 19 years regarding the condition of various properties. On July 18, 1996, she inspected the house at 207

Lincoln Park Boulevard at defendant's request. Defendant told her that he needed the inspection to obtain a building permit and to receive electric service. Dobson discovered that the house had been damaged by a fire and was filled with furniture, tools, boxes, paper, and empty dog food bags. After completing her inspection, Dobson condemned the house as unfit for human habitation and instructed defendant that he needed to clean out the debris, repair the damage, and bring the building up to code before it could be occupied. Dobson testified that the health department's procedures required an inspector to visit condemned property monthly to determine whether the property remained vacant and secured.

Dobson further testified that she was later contacted by defendant's attorney, David Black. On August 18, 1996, she met with defendant and Black at the house. They discussed possible remedies for the code violations at the property. Following the discussion, defendant agreed he would begin cleaning the interior of the house and would contact the health department weekly to arrange further inspections of the house. In exchange the health department agreed to allow defendant to restore electric service, provided that defendant used electricity when necessary for cleaning and repairs. Dobson testified that defendant failed to adhere to the agreement because he never contacted her again and subsequent inspections revealed no change in the condition of the house.

Mary Benson, defendant's ex-wife, testified that she lived at 206 Lincoln Park Boulevard, directly across the street from defendant's house. Benson and defendant had lived together in the house at 207 Lincoln Park Boulevard prior to their divorce, and after the divorce defendant resided alone in the house. She testified that the neighborhood was residential and that she had seen children near defendant's house. She approached the children, followed them home, and warned their parents that they should keep away from the property. Benson testified that defendant's house was damaged by a fire in January 1996 and condemned by the health department. Benson saw defendant often, and he sometimes stayed with her in her house when he was in Rockford following the fire. Defendant told Benson that he was angry that his residence had been condemned.

Benson further testified that in April 1997 defendant was staying with her at her home. Defendant asked her to help him carry some files across the street from his house at 207 Lincoln Park Boulevard to her house at 206 Lincoln Park Boulevard. When they reached the fence surrounding defendant's property, he told Benson to follow directly behind him because traps were set in the yard. As they approached the house, defendant said there were traps that he needed to

take care of before they could enter the house. A screen door led to a porch on the front of the house; the screen was ripped and the door could be unlatched by reaching through the screen. Defendant reached through the screen and used a short stick to set off a rat trap near the latch. He then reached in and unlatched the door. A second door led into the interior of the house. Defendant pulled back a piece of plastic that was covering a window opening in the door and set off a second rat trap. That trap was attached to the door near the latch. Benson entered the house, and defendant told her to stand still because there were more traps in the house. Benson observed another rat trap on the kitchen floor hidden by a plastic bread bag. Benson also observed two chainsaw chains stretched across the dining room, one at ankle height and another behind it approximately six feet above the floor. Benson asked defendant why the traps were set in the house, and he replied that they were to keep out people, burglars, thieves, the health department, the fire department, the police department, anyone that did not live there or was not allowed there. Defendant reset the traps as they left the house.

After the State rested its case, defendant presented his motion to dismiss and moved for a directed verdict. The trial court took both motions under advisement.

David Black, an attorney, testified on defendant's behalf. Black testified that defendant contacted him for assistance in obtaining permits for work on the house. Defendant wanted to activate electric service at the home, but he needed a permit from the building department. The electric company also sought payment for previous unpaid bills. In August 1996 Black arranged a meeting at the house with several county officials, including Dobson. The parties agreed that the house would remain vacant until repairs were completed and that electricity would be connected to a single location bypassing the damaged existing wiring. However, Black encountered difficulty resolving the billing dispute with the electric company, and the electricity remained off during 1996.

Defendant rested his case and again moved for a directed verdict. The trial court took the motion under advisement.

In closing, the State argued that defendant booby-trapped the house because he was angry with the health department and intended to harm any inspectors that might visit the property. Defendant argued that placing rat traps and chainsaw chains in his house was not a crime. Defendant further argued that he was not reckless, because he intended to repair the house but was prevented from doing so because electricity was not available in the house.

The trial court refused defendant's tendered definitions of "resi-

dence" and instead offered its own definition. The jury found defendant guilty of criminal housing management. After the jury was dismissed, the trial court denied the defendant's pending motion to dismiss and motions for a directed verdict. The trial court subsequently denied defendant's posttrial motions and sentenced defendant to two years' conditional discharge. Defendant timely appeals.

■ Defendant first contends that the complaint was insufficient to charge him with criminal housing management. Our review of a challenge to the sufficiency of a charging instrument is *de novo. People v. Smith*, 259 Ill. App. 3d 492, 495 (1994). A defendant has a fundamental right to be informed of the "nature and cause" of the charges against him or her. *People v. Meyers*, 158 Ill. 2d 46, 51 (1994). In Illinois this fundamental right is given substance by statute and incorporated into section 111—3 of the Code of Criminal Procedure of 1963 (the Criminal Procedure Code) (725 ILCS 5/111—3 (West 1998)). See *Meyers*, 158 Ill. 2d at 51; *People v. Davis*, 281 Ill. App. 3d 984, 987 (1996). When the sufficiency of a charging instrument is challenged in a pretrial motion, the inquiry upon review is whether the instrument strictly complies with section 111—3. *Davis*, 281 Ill. App. 3d at 987.

Ordinarily, the requirements of section 111—3 are met when the counts of a complaint follow the statutory language in setting out the nature and elements of an offense. *Davis*, 281 Ill. App. 3d at 987. The relevant inquiry is not whether a charging instrument could have described an offense with more particularity, but whether there is sufficient particularity to allow the defendant to prepare a defense. *Meyers*, 158 Ill. 2d at 54. A charging instrument is a preliminary pleading, and it need not contain more than a cursory statement of the facts. *Smith*, 259 Ill. App. 3d at 497. If the charging instrument meets the minimum requirements of section 111—3(a) but (combined with any discovery the State furnishes) is insufficient to allow the defendant to prepare a defense, he or she can—and should—seek a bill of particulars. *Smith*, 259 Ill. App. 3d at 498; *People v. Intercoastal Realty, Inc.*, 148 Ill. App. 3d 964, 971 (1986).

Defendant cites numerous cases in which a charging instrument that followed the statutory language was found insufficient under section 111—3. In each of these cases the statutory language was insufficient because the charging instrument lacked sufficient specificity to allow the defendant to prepare defense. For example, in *People v. Foxall*, 283 Ill. App. 3d 724 (1996), the defendant was charged by information with disorderly conduct based on transmitting a false report of sexual misconduct to the Department of Children and Family Services. *Foxall*, 283 Ill. App. 3d at 727. The reviewing court held that the information was insufficient because it did not specify the contents of

the false report, and basic fairness required the State to identify the allegedly false statements. *Foxall*, 283 Ill. App. 3d at 727. Similarly, in *Davis*, the reviewing court found that the indictment was insufficient when the defendant was charged with official misconduct based on "disseminat[ing] information," but the indictment did not identify the contents of the alleged communication. *Davis*, 281 Ill. App. 3d at 990. In *People v. Stoudt*, 198 Ill. App. 3d 124 (1990), the reviewing court held that a complaint that charged defendant with resisting a police officer was insufficient when the complaint stated that the officer was engaged in the execution of his official duties but did not identify the authorized act the officer was performing. *Stoudt*, 198 Ill. App. 3d at 128.

However, in *Intercoastal*, the reviewing court held that a charging instrument that tracked the statutory definition of criminal housing management contained in section 12—5 of the Criminal Code of 1961 (the Criminal Code) (see Ill. Rev. Stat. 1981, ch. 38, par. 12—5.1(a) (recodified as amended at 720 ILCS 5/12—5.1(a) (West 1996))) was sufficient to meet the requirements of section 111—3 of the Criminal Procedure Code. Defendant argues that *Intercoastal* was wrongly decided and urges us to depart from this precedent.

In *Intercoastal*, the defendants were charged with criminal housing management under the version of the statute then in effect (see Ill. Rev. Stat. 1981, ch. 38, par. 12—5.1(a)). That version of the statute read:

> "A person commits the offense of criminal housing management when, having personal management or control of residential real estate, whether as a legal or equitable owner of residential real estate or as a managing agent or otherwise, he knowingly permits by his gross carelessness or neglect the physical condition of facilities of the residential real estate to become or remain so deteriorated that the health or safety of any inhabitant is endangered."
> Ill. Rev. Stat. 1981, ch. 38, par. 12—5.1(a).

The information that charged the defendants alleged:

> " '[O]n or about December 16, 1981 through January 5, 1983, \*\*\* [the defendants] committed the offense of criminal housing management in that she/it having personal management or control of residential real estate, to-wit: 905-13 East 61 Street, a/k/a 6101-03 South Drexel, Chicago, knowingly permitted by her/its gross carelessness or neglect the physical condition or facilities of the said residential real estate to become or remain so deteriorated that the health or safety of the inhabitants thereof was endangered, in violation of Chapter 38, Section 12—5.1, Illinois Revised Statutes \*\*\*.' " *Intercoastal*, 148 Ill. App. 3d at 969.

The reviewing court held that the information was sufficient because

the defendant could glean from the charging document that at a particular time and at a particular place the statute had been violated. *Intercoastal*, 148 Ill. App. 3d at 971. The court concluded:

> "It was not necessary to allege the precise details of the condition of the property in the charging instrument. [Citations.] Any further information defendants needed to prepare their defense could be obtained through a bill of particulars [citations] which in fact they did request and receive." *Intercoastal*, 148 Ill. App. 3d at 971.

■ In the case before us, defendant was charged under the amended version of the statute, which reads:

> "A person commits the offense of criminal housing management when, having personal management or control of residential real estate, whether as a legal or equitable owner or as a managing agent or otherwise, he recklessly permits the physical condition or facilities of the residential real estate to become or remain in any condition which endangers the health or safety of any person." 720 ILCS 5/12—5.1 (West 1996).

The complaint that charged defendant alleged:

> "That on the 24th day of April, 1997, in the County of Winnebago, State of Illinois, [defendant] committed the offense of CRIMINAL HOUSING MANAGEMENT in that the said defendant, having control of the house located at 207 Lincoln Park Blvd. in Rockford, Illinois, recklessly permitted the physical condition of that house to remain in a condition which endangered the safety of any person in violation of 720 ILCS 5/12—5.1."

■ We find that the complaint in the present case provides greater specificity than the one found sufficient in *Intercoastal* because it selects one option from each disjunctive phrase. The complaint selected the phrase "physical condition" instead of "facilities" and "safety" instead of "health." The complaint is sufficient for defendant to glean the accusation that, at a specific place, at a specific time, the physical condition of the property endangered the safety of a person. See *Intercoastal*, 148 Ill. App. 3d at 971.

Defendant argues that the complaint was nevertheless insufficient to allow him to prepare a defense, because the complaint failed to precisely identify which conditions of the property the State intended to present as the basis for the charge. Defendant notes many other conditions existed that might have formed the basis for the charge, including abandoned vehicles, a collapsed roof, a rotten floor, missing stairs, and debris filling the house. Defendant argues his ability to prepare a defense was substantially impaired because he could not determine from the complaint which dangerous conditions the State intended to rely upon at trial.

The case before us differs significantly from the cases defendant

relies upon because defendant's argument addresses the nature of the proof rather than the nature of the offense. In each of the cases defendant cites, the defendant was prejudiced because the charging instrument failed to particularize the offense. For example, it is impossible to defend against the accusation that a report was false when the nature of the report is not revealed. See *Foxall*, 283 Ill. App. 3d at 727; see also *Davis*, 281 Ill. App. 3d at 990 (holding the State must set out, at least generally, the words constituting "disseminated information").

Here, the charge against defendant was particularized because the complaint alleged that at a particular place, on a particular date, the condition of the house at that location was unsafe. The key element is the condition of the house, and the basic nature of this offense remains unchanged whether the property was unsafe because defendant had set rat traps, had allowed debris to accumulate, had failed to repair the fire damage, or as a result of a combination of factors. Defendant's argument simply highlights the abundance of evidence the State could have presented against him; it does not reveal an insufficiency in the complaint. Admittedly defendant could more narrowly focus his efforts in preparing a defense if he knew which evidence the State intended to present in support of the charge. However, defendant was free to seek such information through the discovery process or by moving for a bill of particulars. See *Smith*, 259 Ill. App. 3d at 498. We note that defendant did move for discovery and a bill of particulars, and his motions *in limine* suggest that defendant was aware before trial that the State intended to base its case on the presence of rat traps and chainsaw chains. We conclude that, in accordance with *Intercoastal*, an instrument charging criminal housing management that follows the statutory language is sufficient under section 111—3. See *Intercoastal*, 148 Ill. App. 3d at 971. We further determine that, although the complaint could have been more specific, it provided sufficient particularity to allow defendant to prepare his defense. See *Meyers*, 158 Ill. 2d at 54. Therefore, the trial court properly denied defendant's motion to dismiss.

■ Defendant next contends that the State failed to prove him guilty beyond a reasonable doubt of criminal housing management. Generally, when a defendant challenges the sufficiency of the evidence, the standard of review is whether any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt when viewing the evidence in the light most favorable to the prosecution. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). However, when the issue involves statutory construction and the application of uncontested facts, our review is *de novo*. *People v. A.T.*, 303 Ill. App. 3d 531, 535 (1999).

The offense of criminal housing management consists of three elements: (1) that the defendant had management or control of real estate as an owner or managing agent; (2) that the nature of the real estate was residential; and (3) that the defendant recklessly permitted the physical condition or facilities to become or remain in any condition that endangers the health or safety of any person. See 720 ILCS 5/12—5.1 (West 1998); see also Illinois Pattern Jury Instructions, Criminal, No. 11.40 (3d ed. 1992). On appeal, defendant presents challenges to the second and third elements.

Defendant first addresses the third element and argues that the State presented insufficient evidence to establish the requisite mental state beyond a reasonable doubt. This argument is based on *People v. Fornear*, 176 Ill. 2d 523 (1997). In *Fornear*, the defendant was found guilty of both reckless conduct and aggravated discharge of a firearm. *Fornear*, 176 Ill. 2d at 533. The supreme court held that the jury's verdicts were inconsistent because the two counts required distinct mental states, *i.e.*, recklessness and knowledge. *Fornear*, 176 Ill. 2d at 534. The supreme court rejected the State's argument that the mental state of knowledge includes the mental state of recklessness. *Fornear*, 176 Ill. 2d at 531. Defendant argues that the evidence presented in this case established a mental state, knowing or intentional, which is inconsistent with the recklessness required by the criminal housing management statute. This argument presents a challenge to the sufficiency of the evidence which we must review under the *Collins* standard. See *Collins*, 106 Ill. 2d at 261.

■ Defendant argues that the evidence proves that he intentionally set the traps to injure health department inspectors or others. Defendant concludes that the State "mischarged" him and should have charged him with an offense requiring an intentional mental state, such as attempted battery. The decision whether to initiate criminal charges and the determination of which charges should be brought are matters committed to the discretion of the State's Attorney. *People v. Pankey*, 94 Ill. 2d 12, 16 (1983). It is not the role of this court to second-guess the State's trial strategy and speculate whether the jury might have convicted defendant of a more serious charge based on the evidence presented at trial. Rather, our role is to determine only whether the State presented sufficient evidence to establish, beyond a reasonable doubt, the elements of the offenses it did charge. See *Collins*, 106 Ill. 2d at 261.

■ Defendant argues that his actions were intentional or knowing but not reckless. A person acts recklessly "when he [or she] consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow." 720 ILCS 5/4—6 (West 1998). A person

commits criminal housing management when he or she "recklessly permits the physical condition or facilities of the residential real estate *to become or remain in any condition* which endangers the health or safety of *any person.*" (Emphasis added.) 720 ILCS 5/12—5.1 (West 1996). Therefore, in order to establish the requisite mental state, the State was required to prove that defendant consciously disregarded a substantial and unjustified risk that the physical condition of his property endangered the health or safety of any person.

The evidence presented at trial suggested that defendant intentionally set traps in the house. The State argued that he acted with the intent of harming inspectors from the health department. However, even if defendant intentionally placed the traps in the house, his conduct was reckless if he acted with conscious disregard of the consequences of his intentional acts. See *People v. Fornear*, 283 Ill. App. 3d 171, 179 (1996) *aff'd in part & rev'd in part on other grounds*, 176 Ill. 2d 523 (1997). By their very nature, the traps set by defendant were indiscriminate. These mechanical devices could not identify potential victims or determine whether they had lawfully entered the house. Defendant himself could not know when or against whom his traps would be sprung. No matter how strongly defendant was motivated by a desire to harm specific individuals, his conduct was reckless because he created dangerous conditions without regard for the risks to the safety of a large class of unknown and unknowable potential victims. See *Fornear*, 283 Ill. App. 3d at 179. Therefore, the evidence presented, when viewed in the light most favorable to the State, is sufficient for a reasonable jury to conclude beyond a reasonable doubt that defendant acted recklessly. See *Collins*, 106 Ill. 2d at 261.

Defendant also addresses the second element and argues that he was not proved guilty beyond a reasonable doubt because the State failed to prove that the house was residential real estate. The State presented evidence that the house was designed for residential use and evidence that defendant had actually resided in the house prior to the fire. The evidence also reveals that defendant continued to store personal property in the house and sought electric service to allow him to begin repairs. This evidence suggests that defendant had not abandoned the property and intended to use it as a residence in the future. Defendant does not challenge the sufficiency of this evidence but argues instead that his property is not "residential real estate" within the meaning of the criminal housing management statute. Defendant argues that the criminal housing management statute was intended to regulate the landlord-tenant relationship and the phrase "residential real estate" should be limited to buildings that are oc-

cupied and actually being used for residential purposes. Defendant alternatively argues that the phrase "residential real estate" should be given the same meaning as "dwelling" in the residential burglary statute (see 720 ILCS 5/2—6(b) (West 1996)) and be limited to those structures in which someone intends to reside in a reasonable period of time. These arguments present questions of statutory interpretation that are subject to *de novo* review. See *A.T.*, 303 Ill. App. 3d at 535.

The cardinal rule of statutory construction is to give effect to the true intent and meaning of the legislature. *Kunkel v. Walton*, 179 Ill. 2d 519, 533 (1997); *People v. Woodard*, 175 Ill. 2d 435, 443 (1997). The best indication of the legislature's intent is the language of the statute itself. *Kunkel*, 179 Ill. 2d at 533. Statutory words are presumed to have their ordinary and popularly understood meanings. *People v. Stork*, 305 Ill. App. 3d 714, 723 (1999). There is no rule of construction that allows a court to declare that the legislature did not mean what the plain language of the statute imports. *Woodard*, 175 Ill. 2d at 443.

Defendant argues that the criminal housing management statute was intended to protect tenants. Defendant points to section 12—5.2 of the Criminal Code (720 ILCS 5/12—5.2 (West 1996)), which allows the State's Attorney to seek an injunction preventing any person who owns or manages real estate from collecting rent if the property endangers any person. The rent provisions of section 12—5.2 suggest that an injunction is available as a remedy only when property is currently leased to residential tenants. However, the plain language of section 12—5.2 states that an injunction is available "[i]n addition to any other remedies." 720 ILCS 5/12—5.2(a) (West 1996). Section 12—5.1 contains no language limiting its application to residential real estate that is leased. We cannot depart from the plain language of a statute and read into it limitations or conditions the legislature did not express. *Kunkel*, 179 Ill. 2d at 534. Sections 12—5.1 and 12—5.2 are clearly interrelated, but there is nothing in the plain language of either section that requires us to limit the phrase "residential real estate" to property that is the subject of a landlord-tenant relationship. Section 12—5.2 is an additional remedy available for a subset of those properties that are subject to the provisions of section 12—5.1. Accordingly, we hold that based on the plain language of section 12—5.1 the legislature did not intend to limit the phrase "residential real estate" to property that is the subject of a landlord-tenant relationship. See *Woodard*, 175 Ill. 2d at 443.

Defendant alternatively argues that, even if the phrase "residential real estate" includes property that is not leased commercially, it

does not include vacant or condemned buildings and should apply only to those buildings in which someone resides or intends to reside within a reasonable time. Defendant argues that the phrase "residential real estate" should be given the same meaning as "dwelling" has in the residential burglary statute (720 ILCS 5/19—3, 2—6 (West 1996)). We disagree.

First, the legislature did not use the word "dwelling" in section 12—5.1. If the legislature uses certain words in one instance and different words in another, we may infer that the legislature intended a different result. *Costello v. Governing Board of Lee County Special Education Ass'n*, 252 Ill. App. 3d 547, 558 (1993). Consequently, we conclude that the legislature did not intend the phrase "residential real estate" to have the same meaning as "dwelling."

Second, Illinois courts have not previously limited the phrase "residential real estate" to those areas used or designed for use as a dwelling place. For example, in *People v. Khan*, 136 Ill. App. 3d 754 (1985), the reviewing court held that evidence of disrepair of both the exterior and interior of the building supported the defendant's conviction. *Khan*, 136 Ill. App. 3d at 763. The evidence revealed, among other things, that portions of the rear porch of the building were rotted or missing and that the corridors were littered with debris. *Khan*, 136 Ill. App. 3d at 756. Similarly, in *Intercoastal*, the charges stemmed in part from a damaged rear porch, broken marble in the building vestibule and rat-infested garbage on the premises. *Intercoastal*, 148 Ill. App. 3d 964. Under defendant's proposed interpretation, the owner of an apartment building could allow the common areas of the real estate to deteriorate and fill with garbage, as long as he or she maintained the interiors of the apartments. The owner would not be liable under the criminal housing management statute because the risks to health and safety would be confined to areas where no one was intended to reside. When construing a statute, we must assume that the legislature did not intend an absurd or unjust result. See *People v. Stencil*, 306 Ill. App. 3d 273, 278-79 (1999). Therefore, we conclude that the legislature intended the phrase "residential real estate" to have a broader application than the word "dwelling" and intended the criminal housing management statute to apply not only to real estate actually used as a dwelling but to all real estate that is residential in nature, including those areas associated with residential real estate but not intended for habitation and areas intended for habitation but not currently used for habitation.

Third, we note that the legislature has amended section 12—5.1. The original language applied to residential real estate that is "so *deteriorated* that the health or safety of any *inhabitant* is endangered."

(Emphasis added.) Ill. Rev. Stat. 1985, ch. 38, par. 12—5.1. The statute as amended applies to residential real estate that is "in *any condition* which endangers the health or safety of *any person*." (Emphasis added.) 720 ILCS 5/12—5.1 (West 1996). When the legislature amends a statute, it is presumed that it intended to effect some change in the law as it formerly existed. *People v. DeMont*, 146 Ill. App. 3d 437, 442 (1986); see also *Woodard*, 175 Ill. 2d at 449. The amended statute broadens application of section 12—5.1 in two ways. The use of the term "any condition" suggests that the legislature intended the revised statute to reach as many threats to health and safety as possible. More importantly, the replacement of the word "inhabitant" with the phrase "any person" implies that the legislature intended to extend the protection of the revised statute to the largest possible class, and further implies that a structure need not be inhabited or even habitable to fall within the meaning of the phrase "residential real estate."

Finally, public policy supports an interpretation of "residential real estate" that includes abandoned or condemned property. Residential real estate, including unoccupied structures, may be visited by many different people, including police officers, firefighters, utility company employees, letter carriers, or delivery people. These individuals should be protected from hazards not ordinarily anticipated on residential property. Moreover, parcels of residential real estate are often found near one another in larger residential neighborhoods. A dilapidated or vermin-infested structure presents a risk not only to those who might inhabit the building but also to neighboring residents. The legislature's use of the phrase "any person" suggests that the criminal housing management statute should be construed broadly to protect neighboring residents and others from unsafe or unhealthy conditions. We conclude that the phrase "residential real estate" refers to the character of the real estate, not just its current use, and includes abandoned or condemned property if that property is intended for or was previously intended for human habitation. The undisputed evidence was sufficient to establish that the nature of defendant's property was residential as we have construed the statute. Therefore, the State did not fail to prove defendant guilty beyond a reasonable doubt.

■ Defendant finally contends that the trial court erred when it refused the instructions he tendered and offered its own instruction defining the word "residence." Defendant argues that the court's instruction incorrectly advised the jury of an element of the offense and, therefore, is a fundamental error which cannot be dismissed as harmless. See *People v. Smith*, 295 Ill. App. 3d 405, 411 (1998). The decision to draft and give a nonpattern instruction is a matter com-

mitted to the discretion of the trial court. *People v. Johnson*, 285 Ill. App. 3d 307, 309-10 (1996).

Defendant tendered two nonpattern jury instructions defining "residence." The first read "[t]he word 'residence' means a residential building or complex which is the actual dwelling place of any person." The second read "[t]he term 'dwelling place' means a house in which at the time of the alleged offense the owners actually reside." The trial court refused these two instructions and offered its own instruction over the objection of both defendant and the State. The trial court's instruction read "[r]esidence means a building or a portion of a building which is used or intended for use as a human habitation, home, or dwelling place."

Defendant argues that the definition of "residence" given the jury was erroneous because it did not require an intent to reside within a reasonable time. As we observed above, the phrase "residential real estate" refers to the character of real property, not merely its use. The instruction given is narrower than, but consistent with, our construction of the phrase "residential real estate." Therefore the trial court did not abuse its discretion when it instructed the jury with its definition of "residence." See *Johnson*, 285 Ill. App. 3d at 309-10.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

RAPP and GALASSO, JJ., concur.