(No. 90960.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. TABITHA POLLOCK, Appellant.

*Opinion filed October 18, 2002.—Rehearing denied December 2, 2002.*

RARICK, J., took no part.

THOMAS, J., joined by GARMAN, J., concurring in part and dissenting in part.

Jane E. Raley and Lawrence C. Marshall, both of Chicago, and R. Linus Chan, Michele Kunitz, Haley Schaffer, Jennifer Smiley, Ashley Brant, Kristin Cowan, Steven Heiser, Kerry Hotopp, Brianna Smith, Emilio

Torres-Lumsden, Gregory Swygert and Stephanie Weiner, law students, for appellant.

James E. Ryan, Attorney General, of Springfield, and Terrence Patton, State's Attorney, of Cambridge (Joel D. Bertocchi, Solicitor General, and William L. Browers and Colleen M. Griffin, Assistant Attorneys General, of Chicago, of counsel), for the People.

CHIEF JUSTICE McMORROW delivered the opinion of the court:

On November 3, 1995, defendant Tabitha Pollock was indicted in the circuit court of Henry County on charges of first degree murder (720 ILCS 5/9—1(a)(2), (a)(3) (West 1994)) and aggravated battery of a child (720 ILCS 5/12—4.3(a) (West 1994)) after her three-year-old daughter, Jami Sue Pollock (Jami), died as a result of being struck by defendant's paramour, Scott English (Scott). A jury found defendant guilty of felony murder (aggravated battery of a child) and aggravated battery of a child on a theory of accountability. The conviction for aggravated battery of a child was merged with the murder conviction and defendant was sentenced to a term of 36 years' imprisonment for the murder conviction.

Defendant appealed her conviction and sentence to the appellate court. In a published opinion, defendant's conviction for murder was affirmed.[1] 309 Ill. App. 3d 400. Thereafter, defendant's petition for leave to appeal was granted. 177 Ill. 2d R. 315. For reasons that follow, we now reverse defendant's convictions.

---

[1]In the appellate court, defendant contested the constitutionality of the Truth In Sentencing Law enacted by Public Act 89—404. Based on this court's holding in *People v. Reedy*, 186 Ill. 2d 1 (1999), the appellate court ruled that the law was unconstitutional and that defendant was entitled to receive credit for good conduct. That ruling is not a part of this appeal.

## BACKGROUND

The evidence of record indicates the following.

At 4:58 a.m. on October 10, 1995, a Kewanee ambulance manned by two emergency medical technicians (EMTs) arrived at 720 Pleasant Street in Kewanee, Illinois, in response to a 911 call that a three-year-old child was not breathing. Upon their arrival, the EMTs were immediately directed to the upstairs of the home, where they found defendant performing cardiopulmonary resuscitation (CPR) on a small child, later identified as Jami. According to James Heisner, one of the EMTs, Jami's skin tone was bluish and she was unresponsive, but her body was warm. Scott told Heisner that he discovered Jami's lifeless body wrapped in her blankets when he checked on Jami and her brother, Preston, who had been sleeping on a water bed in another bedroom.

Jami was immediately transported to Kewanee Hospital. Defendant rode in the ambulance and assisted in continuing CPR on Jami while en route. They arrived at the hospital at 5:05 a.m. There the emergency room staff, headed by Dr. Renato Parungao, took over resuscitation efforts. Dr. Parungao and his staff worked on Jami for nearly an hour, but Jami never showed any signs of revival. When the hour passed without any success, resuscitation efforts were terminated and Jami was pronounced dead.

Although one police officer who responded to the English home testified that defendant appeared emotionless, several other witnesses testified otherwise. Heisner, one of the EMTs, testified that defendant was working diligently at trying to revive Jami when they arrived at the English home. When his partner took over doing CPR, Heisner said, defendant appeared shaken and frightened. Defendant asked to accompany Jami in the ambulance and seemed deeply concerned.

Karen Heying, a nurse at the hospital, testified that she was assigned to stay with defendant while the

emergency room staff worked on Jami. Heying described defendant as "frantic." Heying said she and defendant paced the floor in an attempt to keep defendant calm, but when defendant was told that Jami could not be saved, defendant had a complete emotional breakdown.

After Jami was pronounced dead, defendant was allowed to hold Jami. She sat rocking Jami for a long while. When they took Jami from defendant, defendant collapsed on the floor and cried uncontrollably.

There was no apparent cause for Jami's death. Dr. Parungao, having noticed some bruises on Jami, asked an emergency room nurse to make a detailed record of Jami's physical condition, documenting every noticeable mark on Jami's body. In addition, the coroner ordered that an autopsy be performed.

Dr. Parungao previously had seen Jami on October 7 when Jami was brought to the emergency room by Scott, who reported that Jami hit her head on the sink when she fell off a cookie tin in the bathroom while trying to brush her teeth. Dr. Parungao sutured a cut on Jami's head. He accepted the story given him by Scott and saw nothing at that time which made him suspect that Jami was being abused.

Terri Chapman, a registered nurse at Kewanee Hospital, was working in the emergency room on the morning of October 10, 1995. She assisted Dr. Parungao in attempting to resuscitate Jami and, when their attempts failed, she called the coroner, who, in turn, reported the death to the police. Upon Dr. Parungao's order, Chapman made a detailed inspection of Jami's body. According to her notes, there were 11 marks on Jami's body, which she described as follows: three nickel- to quarter-sized bruises across her upper back; one two- to five-centimeter abrasion down the middle of her back; one quarter- to half-dollar-sized bruise just above her left elbow, one half-dollar-sized bruise on her left buttock;

one half-dollar-sized bruise on her right hip; three quarter-sized bruises on her left rib area; and a bruise on her shin. Chapman also noted the healing laceration on Jami's head, where Jami had received stitches a few days earlier. Chapman later testified at defendant's trial that, based on her knowledge and experience regarding bruises and their coloration over time, she was of the opinion that Jami's bruises were of different ages. Some of the bruises were "bluish," indicating to her that the bruise was 2 to 3 days old. Some bruises were "greenish," indicating an age of 4 to 5 days and some were "brownish-yellow," indicating an age of 10 to 14 days old. Chapman said the bruises on the hip, buttocks, and shin appeared to be the oldest, while the ones on Jami's rib area and upper back appeared to be newer.

On the afternoon of October 10, 1995, the date of Jami's death, Dr. Violette Hnilica, a forensic pathologist, began an autopsy on Jami's body to determine the cause of her death. The autopsy first involved an external examination, followed by an internal examination which was conducted the next day. Dr. Hnilica testified that the autopsy took a great deal of time because she, in conjunction with police investigators and crime-scene technicians, collected and preserved evidence throughout the autopsy. Using various techniques, including ultraviolet light, Jami's body, as well as her clothing and bed linens, were examined, and attempts were made to match patterns from various items to marks found on Jami's body.

In general, Dr. Hnilica's external examination revealed "bruises of various ages over her body" and "splotchiness of color over her face with areas of pallor or paleness." A detailed visual inspection of Jami's body revealed the following: a greenish-blue bruise on the upper-right chest; a greenish-blue bruise mid-chest, near the right breast; a bluish-green bruise in the right abdomen; a greenish-brownish bruise on the left chest, near

the armpit; a green contusion mid-chest, near the left breast; and a greenish bruise on the mid to upper back. Dr. Hnilica testified that the above-noted bruises were ones that appeared to be older in age—at least days in duration. She later admitted on cross-examination that none of these older injuries appeared life-threatening and all of the bruises could have been attributable to accidental childhood injuries.

With the aid of ultraviolet light, however, Dr. Hnilica found several additional bruises or marks which, in her opinion, had occurred just minutes or, at the most, hours prior to Jami's death. The recent injuries included: an area of swelling just above the right ear; a faint purple bruise on the tip of the right ear and a larger purplish bruise on the lower part of the right ear; "splotchy coloration" (mixed areas of paleness and pinkness) of the face (across the cheeks, bridge of nose, and mouth); abrasions on the sides and tip of the nose; a bruise and scraped area under her chin; a large area of bruising (extensive and not well-defined) across her chest, accompanied by "curved claw marks" which were later matched to Jami's own left-hand fingernails; bruising to the left breast area and upper abdomen; and two areas of scrapes in the left lower chest area. On Jami's back there were bruises to the skin along the vertebral process (spine) and faint bruises over the upper back area. Slightly older bluish bruises were found on the right buttock, the left hip, and the right forearm, but on the left forearm there was a newer pinkish bruise.

Dr. Hnilica explained that areas of pallor, such as that observed on Jami's face, can occur "when something presses the blood out of the facial tissues," as in smothering. Also, asphyxia can cause petechiae—ruptures of the tiny blood vessels—in the eyelids, face, and oral mucosa, as well as the upper neck and in the thymus gland. Petechiae were found in the conjunctiva of Jami's eye

and her thymus gland, consistent with her being smothered. Further, the clawing marks found on Jami's chest were also indicative of smothering. Dr. Hnilica testified that a smothering victim often will claw at the thing obstructing their ability to breath and, in doing so, injure themselves in this manner.

When conducting the internal examination of Jami, Dr. Hnilica peeled back Jami's scalp. In doing so, Dr. Hnilica was able to determine that the swelling, which had been observed over Jami's right ear, was due to torn blood vessels, which allowed blood to pool in the tissues. This type of injury, Dr. Hnilica said, was likely caused by a massive, heavy blow to the head. In addition to this one massive injury, the doctor was able to discern 13 distinct areas of hemorrhage, each representing an injury to the head. It was noted, however, that estimating the age of these bruises is not an exact science and that several, perhaps as many as eight of these bruises, were not recent injuries.

Dr. Hnilica concluded that the injury to Jami's head, evidenced by the large area of hemorrhage, caused the brain to be "shaken up." This caused Jami's brain to swell to the size of an adult brain. Dr. Hnilica identified several photographs that had been taken during the autopsy, depicting the injury to the brain, as well as the areas of bruising, as described above.

Dr. Hnilica opined that the swelling of the brain, which was likely caused by a heavy blow to the head, was the most significant injury suffered by Jami. However, there was also evidence of injury to the abdomen. The injury here was consistent with a massive, rapid or heavy force being applied to the abdomen—as with being kicked, "stomped," or "kneed" in the abdomen area.

Based on all of the evidence from the autopsy, Dr. Hnilica concluded that Jami's death had been caused by blunt force trauma to the head (brain edema) and

asphyxia. In her opinion, either cause, standing alone, could have resulted in death. However, since there was evidence of both, it was impossible to say "the relative proportion that each contributed" to causing Jami's death.

On the evening of October 11, 1995, defendant and Scott met with police at the Kewanee police station, where they were questioned, individually, about what had transpired prior to Jami's death.[2] Defendant, who was 25 years old at the time, told police that she and her children, Preston, age five, Jami, age three, and David, age two, began staying with Scott English, who is David's father, after she resumed her relationship with Scott sometime in August 1995. In late September 1995, they moved in with Scott at the home of Scott's parents, Hilda and Raymond English, at 720 Pleasant Street in Kewanee. Pam, the girlfriend of Scott's brother (who was in jail), and Pam's young son also lived at the home. Defendant told police that she and Scott slept in one of the upstairs bedrooms. Their son, David, had a bed in the same room. Preston and Jami slept together in another upstairs bedroom.

When asked if she was aware of any bruises on Jami, defendant stated that she gave Jami a bath on October 9, 1995, sometime between 11:30 a.m. and 1:30 p.m. At that time, she noticed only a few small bruises. Some of the bruises could have been attributed to the fact that, on October 7, 1995, Jami had fallen off a round tin in the bathroom and hit her head. Jami was taken to the hospital and received stitches. This was the only "owie" on Jami that defendant knew about. Defendant recalled,

---

[2]Much of what defendant told police during this interview was admitted into evidence at defendant's trial through the testimony of Lieutenant Rod Huber, through defendant's grand jury testimony (portions of which were read to the jury), and through defendant's trial testimony.

however, that two to five days before Jami's death, Jami hit her head on the bannister of the stairs as she was going upstairs. Defendant also remembered another occasion when Jami's head got bumped into the bannister as Scott was carrying Jami upstairs. Other than those instances, defendant was unaware of any injuries to Jami. Defendant denied ever striking her children, except for a small swat on the behind, and she assured police that, to her knowledge, no one in the English home had ever mistreated them.

Defendant told police that, on the evening of October 9, she and the children ate dinner at about 6:30 p.m. and, when Pam and her son came home at about 7 p.m., the children had some ice cream. The children played together downstairs until about 9:15 p.m., when defendant took her children upstairs to her bedroom to watch some television. David fell asleep in his own bed in her room. Preston and Jami fell asleep in her bed. Defendant said she moved Jami and Preston to their own bed around 11:30 p.m. and then went downstairs to do some laundry. When she checked on Jami and Preston at about 12:15 a.m., they seemed fine.

Defendant noted that Scott arrived home at about 12:40 a.m. and, sometime after his arrival, she noticed that the kids "were a little restless." She went to check on them and found Scott at the foot of their bed, telling them to go back to sleep. Defendant said she immediately left the bedroom and stood outside the door because she was afraid that the kids would wake up if they saw her. Scott then went downstairs to get something to eat and came back upstairs to eat with her in the bedroom. She and Scott talked while Scott ate. Then they each took a shower.

Defendant explained that, to get to the bathroom, it was necessary to walk through the bedroom where Jami and Preston slept. Defendant recalled that, when Scott

returned after taking his shower, he told defendant that he checked on the children and they were fine.

Defendant said that after she and Scott showered, they watched some television until about 3 or 3:30 a.m. and then went to bed. Before going to sleep, Scott went to the bathroom and, on his way, checked on the children once again. When he returned, he told defendant that Jami had been wrapped in her covers and he had fixed them. Sometime later that morning, defendant and Scott were awakened by David crying. David had a fever, so Scott gave David some Tylenol. When he did, David spit up on Scott. Scott went to wash up and, again, passed through the children's room. Shortly thereafter, Scott said something about hearing a noise. The next thing defendant remembered was Scott, standing in the bedroom doorway, yelling at her, waking her up, and telling her that Jami was not breathing. Scott told her that he went into the bedroom, found Jami wrapped in her blankets and, when he unwrapped her, found her lifeless and not breathing. Defendant said that she went to Jami's room, picked her up and brought her into her own bedroom, where she started doing CPR. She screamed at Scott to call 911. Defendant said that Scott later told her that he had tried performing CPR on Jami, too, but she did not know for how long.

At this point in the interview, Lieutenant Rod Huber, one of defendant's interviewers, advised defendant of her *Miranda* rights and informed her that a preliminary report from the autopsy revealed that Jami had not died of natural causes, but that she had died from swelling of the brain caused by blunt force trauma and asphyxia— the cutting off of her air supply by suffocation. Lieutenant Huber described defendant's response to this information as one of shock and astonishment. He said she seemed to have difficulty grasping the meaning of what he was telling her. Defendant did not understand how

Jami could have been hurt because, she said, to her knowledge no one in the English household had ever hit or mistreated her children. Defendant also maintained that she had done nothing to harm Jami in any way.

The interview was then interrupted by Dee Shannahan, a DCFS investigator, who asked to speak with Lieutenant Huber. Outside the interview room, Shannahan informed Huber that Scott had made admissions regarding hitting Jami. Huber returned to the interview room and told defendant that Scott admitted striking Jami. Lieutenant Huber said that defendant seemed to have difficulty believing that Scott had done anything to Jami because, defendant said, she had never known Scott to be abusive toward her children in the past. Defendant maintained that she was completely unaware that Scott had done anything to Jami. In fact, after learning of Scott's complicity for her daughter's death, defendant noted that it now made sense that, since Jami's death, Scott had continually sought reassurance from her that she loved him and had even asked her to marry him. Defendant also said she now understood why, before coming to the police station, Scott told her that he was scared because "they always blame the one who finds the dead child and I'm just scared I'll get blamed."

As indicated above, while defendant was being interviewed in one room at the police station on the evening of October 11, 1995, Scott was being questioned in another room. In the course of this questioning, he admitted striking Jami on the head on the morning of October 10, 1995. Scott made a voluntary statement, which was tape recorded. His taped statement was played for the jury at defendant's trial. Jurors were also given copies of the transcript to follow along with as the tape was played.

In this statement, Scott corroborated much of what defendant told police. He said he had gone to work at 4

p.m. on October 9, 1995, and worked until 12:30 a.m. on October 10, 1995, arriving home about 12:50 in the morning. When he got home, he checked on Jami and Preston and found that Jami was "bundled up" in her blanket. He said he went to his own bedroom and told defendant that Jami was bundled up in her blankets. Scott and defendant then went back into Jami and Preston's bedroom to fix the blankets. The children heard defendant's voice and began to wake up and cry for their mom. Defendant hurried out of the room so the children would go back to sleep. Scott then "unbundled" Jami and "set them [the blankets] the right way."

Scott said that, after fixing the blankets, he got something to eat, talked with defendant, and then showered. Scott then went downstairs to get David his bottle. On the way back, he checked on the children again and they were fine. He watched television until about 3 a.m. and, before going to sleep, went to the bathroom. At that time he checked on the children once again. Scott said that when he turned the light on briefly, Preston opened his eyes, but Scott told him to go back to sleep. Scott said Jami was wriggling under her blankets and she was all bundled up again. Scott said, "Then I yelled at her and I hit her twice in the back of the neck or the head, one of them with the palm of my hand." Scott described the first strike as a "hammering motion," but said the second strike was softer. He said Jami cried, but not loudly. He said he "didn't mean anything. I just wanted to let her know that she shouldn't be covering up like that."

Scott said he went back to bed and was awakened around 4:30 a.m. by David crying. David had a fever, so Scott got up to get him some medicine. When he gave David the medicine, David spit it up and Scott spilled medicine all over his hands and the sheets. Defendant took David into their bed to settle him down, while Scott

went to the bathroom to wash up. When Scott walked through the children's room to the bathroom, Preston woke up briefly, but then lay back down. Jami, however, was still all bundled up in her blankets. Scott said,

"Then I pulled the blankets up and she spun and there was no movement. She was lifeless and I proceeded to do CPR after that. I leaned down to listen if she was breathing or if she had any pulse and then I did CPR."

Scott estimated that he performed CPR for about five minutes before calling anyone because he was "panicking." He said,

"I didn't want this to happen. When I corrected her I never knew that I was going to hurt her that bad."

The police asked,

"So at the time you were doing CPR you believed that it was because of the hitting that you had done?"

Scott responded,

"Yes. Because that's the only thing that I have done to her. I have never layed [sic] a hand on her. I loved her so much."

Scott told police that defendant was not aware that he struck Jami and that, until then, he had told no one what he had done. He then asked if he could be allowed to speak to defendant so he could tell her himself what had happened to Jami.

Scott adamantly maintained that he hit Jami only twice on the morning of October 10, 1995. When asked to explain other bruises found on Jami, Scott told police that Jami had bruises as a result of three accidental incidents which occurred on October 7, 1995. Scott said that, on the morning of October 7, he "accidentally" grabbed Jami by the neck. This happened, Scott said, because Jami had been misbehaving at the breakfast table—keeping food in her mouth without chewing or swallowing. Both he and defendant corrected Jami and, when Jami refused to behave, Scott ordered her to her room. Jami got off her chair and started to run toward her mother. Scott grabbed Jami to prevent her from go-

ing to her mother. Scott said that he "meant to grab her by the shoulders and my hand, I caught her by the neck."

Scott also told police that, after breakfast, he gave his son, David, and Jami a bath together. Scott said that, during the bath, Jami stood up in the tub and stepped on David's leg. David started to scream. Scott said he "leaped toward David to move him out of the way and I sort of put my elbow in the way of the collision and Jami and I might have pushed her back a little bit. She fell backwards and hit her head or back or what have you however she landed." Scott said Jami fell onto the linoleum floor.

Later that same day, October 7, Jami fell in the bathroom and hit her head, requiring stitches. Scott insisted, however, that he had done nothing to cause the incident. He said that Jami climbed up on a cookie tin to get to the toothpaste when she accidentally slipped and fell.

On October 12, 1995, Scott was arrested and charged by information with two counts of murder and one count of aggravated battery of a child. On the afternoon of October 12, 1995, Sherry Ranos, a criminal investigator with the Illinois State Police, accompanied by DCFS Investigator Dee Shannahan and Kewanee Police Officer Ken Ince, went to the Pollock residence at 100 South Burr Boulevard in Kewanee to speak with defendant. At that time, in response to questions regarding Scott's behavior toward defendant's children and with the benefit of the knowledge that Scott had murdered Jami, defendant was able to recall other incidents which she had previously dismissed as accidents, but which now suggested that Scott had been abusive to her children in the past. One such incident occurred in July 1995 and involved defendant's son Preston. Defendant explained that Scott had been baby-sitting Preston and Jami for her on this occasion. When she picked up the children,

she noticed some scrapes on Preston's neck. Defendant said that Scott told her that Preston started to slip in the bathtub and, when Scott went to grab him, Scott accidentally caught Preston by the neck. Preston, who was five years old, gave different explanations for the injury—at first, Preston told defendant that Scott choked him and held him under the water, but later he said that kids hit him with sticks.

Defendant also recalled that, a week or two prior to Jami's death, there was an incident when defendant had been away from the home and Scott was watching the children. When defendant returned home she saw some bruises on Jami. Scott told her that Jami had fallen down the stairs. Defendant said that she questioned Scott about the fall, but that Scott's father had corroborated that Jami had fallen down the stairs. Defendant admitted that Jami had complained sometimes that Scott was mean, but she thought it was because Scott made Jami stand in the corner for "time-out."

In November 1995, the grand jury heard evidence on the case and returned three-count indictments against both defendant and Scott for murder and aggravated battery of a child. Count I alleged knowing murder, count II alleged felony murder based on aggravated battery of a child, and count III alleged aggravated battery of a child. The State later dismissed counts I of both indictments.

Scott was tried by a jury and found guilty of first degree (felony) murder and aggravated battery of a child. He was found ineligible for the death penalty and was sentenced to natural life imprisonment. His conviction was affirmed on August 18, 2000, in a Rule 23 order. *People v. English*, No. 3—96—0767 (2000) (unpublished order under Supreme Court Rule 23).

Defendant's jury trial commenced on June 17, 1996. In opening statements, the State told the jury that Jami "was beaten and asphyxiated on October 10th of 1995,

and prior to that, Jami had been abused, specifically on October 7th of 1995." The State also told the jury:

"In the last few hours of Jami's death, only two adult people had contact with Jami: The defendant and her boyfriend, Scott English. In this case, the State is going to prove beyond a reasonable doubt that Jami's mother, the defendant, either murdered Jami herself or allowed her boyfriend, Scott English, to murder Jami by giving him access and control over Jami when she knew or should have known of his abusive nature and his danger to Jami."

This *mens rea* standard—knew or should have known—was repeated numerous times throughout the State's opening statement. Defense counsel also referred to this standard, stating in opening argument:

"So you are going to hear people, a lot of people, get on the stand and say that Tabitha apparently was a terrible mother, but a terrible mother doesn't go to prison for killing her child. You have to specifically find that she knew or should have known—and I mean a very strong should have known—that Scott English had done anything prior to Jami Sue's death to lead her to believe that he was going to do it at the time that he did."

During trial, both the State and the defense produced several witnesses. The majority of the evidence focused on the events surrounding Jami's death and prior incidents of Scott's mistreatment of defendant's children, which, the State argued, should have placed defendant on notice that Scott was a danger to the children. However, that evidence was countered by the testimony of several witnesses, including defendant's mother and sister, as well as Scott's mother and father, who testified that, despite being aware of some bruises on Jami, they never suspected that Scott had been mistreating defendant's children. Every witness stated that, prior to October 11, 1995, they believed that Jami's bruises, none of which were life-threatening, had been the result of accidental injuries.

Over defense counsel's objection, the State presented

evidence that defendant had neglected her children and that they were often dirty and disheveled. There was testimony from one witness that defendant, on one occasion in 1994, slapped Jami on the head. Also, a nurse practitioner from the Family Medical Clinic in Galva testified that she filed a report against defendant with DCFS in August 1994. The nurse practitioner testified that, when defendant brought Jami in for a vaccination, she noticed that Jami had a red, swollen area around her right eye. Defendant explained that this was a bug bite, but the nurse was skeptical. The nurse also noted a bruise on Jami's left ear, which defendant said was caused by a fall against a chair. There was also a bruise on Jami's forearm, which the nurse believed looked like a "thumbprint" mark, but defendant said was a bee sting. Later, a DCFS representative testified that, as a result of this report, defendant was "indicated" for environmental neglect, medical neglect (failure to follow the recommended vaccination schedule), and risk of harm due to cuts and bruises. The report made by the nurse practitioner was defendant's only indicated report and no further action was taken. The sum of the evidence established that defendant, though neglectful, was not known to be physically abusive to her children.

Dr. McCaw testified that, after Jami's death, he was asked by DCFS to examine Preston and David to determine whether they showed signs of abuse. Though both had minor bruises, Dr. McCaw testified, he did not feel that the bruises were indicative of abuse.

In closing argument, the State advised the jury that accountability may be shown by evidence of a common criminal design, which the prosecutor defined as "evidence that a defendant, a parent, knew or should have known about a danger from another person, a boyfriend, and continues to allow that boyfriend access to the child knowing of that danger." The State further argued:

"It's clear and it's beyond a reasonable doubt in this case that she knew or should have known what was going on here. And that's important: Knew or should have known. And you can use your common sense and experience in life when you look at everything here. She should have known. She should have done something. Because any loving, reasonable, caring parent would have seen it; they would have done something about it.

But not Tabitha Pollock. All she did was continue to allow Scott English to have control over Jami. She continued to give him access and allowed him in the end to do what he ultimately did. And for that, she's as guilty as Scott English of murder and aggravated battery of a child. Because for [sic] without Tabitha Pollock, Scott English could not have carried out this murder. Without Tabitha Pollock, Jami Sue Pollock would have never been at 720 Pleasant Street, and she would have never been murdered.

And the law in the area of accountability has expanded over the years to include just this type of situation. And it's clear that a parent who does not protect that child from a known danger, or when they should have known about the danger and continue to allow access to that child by this danger, this person that's a danger, that makes her accountable for everything that happened."

After hearing all of the evidence, the jurors were instructed on the law. In addition to the Illinois Pattern Instruction (IPI) on accountability, three non-IPI instructions (Nos. 10, 11, and 13) were given over defendant's objection. Instruction No. 10 provided:

"A parent has a legal duty to aid a small child if the parent knows or should have known about a danger to the child and the parent has the physical ability to protect the child.

Criminal conduct may arise not only by overt acts, but by an omission to act where there is a legal duty to do so."

Instruction No. 11 provided:

"Actual presence at the commission of the crime is not a requirement of accountability."

Instruction No. 13 provided:

"For accountability, intent to promote or facilitate crime

may be shown by evidence that the defendant shared a criminal intent of the principal or by evidence that there was a common criminal design."

After four hours of deliberation, the jury found defendant guilty as charged of first degree (felony) murder and aggravated battery of a child. The trial court sentenced defendant to 36 years' imprisonment on the murder conviction, stating, "[T]he finding of guilty was based not upon her own direct action, but upon her failure to act to protect her child from the actions of her live-in boyfriend."

Defendant's conviction and sentence were upheld on appeal by the appellate court. 309 Ill. App. 3d 400. This court then granted her petition for leave to appeal. 177 Ill. 2d R. 315.

## ANALYSIS

The first issue raised by defendant in the appeal before this court is whether the jury was properly instructed. Defendant argues that because her convictions for felony murder (predicated on aggravated battery of a child) and aggravated battery of a child were premised on a theory of accountability, an essential element of the charged offenses is the *mens rea* requirement for accountability. Aggravated battery of a child is an offense which requires a knowing or intentional state of mind (720 ILCS 5/12—4.3 (West 2000)), and "[a]ccountability, tied as it is to the crime charged, must comport with the requirements of that crime" (*People v. Stanciel*, 153 Ill. 2d 218, 234 (1992)). Thus, defendant argues that in order for her to be held accountable for the predicate felony—aggravated battery—the jury was required to find beyond a reasonable doubt that she possessed a knowing or intentional state of mind. Defendant contends, however, that one of the nonpattern jury instructions given to the jury (Instruction No. 10), and the prosecutor's argument based on this instruction, mis-

stated the *mens rea* requirement and told the jury that defendant could be held accountable for aggravated battery of a child based on a negligent state of mind, that is, the jury was told that defendant could be accountable if she did not know, but "should have known," that Scott had abused Jami in the past.

Defendant also argues that, based on the evidence presented at trial, no properly instructed jury could find beyond a reasonable doubt that she was accountable for the aggravated battery of her daughter, which formed the underlying basis for her felony-murder conviction. In a supplemental brief, defendant further argues that, in light of this court's recent opinion in *People v. Morgan*, 197 Ill. 2d 404 (2001), aggravated battery can never serve as the predicate felony for a charge of felony murder and, accordingly, her felony-murder conviction cannot stand.

We first consider defendant's challenge to the propriety of the jury instructions. Our task is to determine whether the instructions given to the jury in the case at bar, " 'considered as a whole, fully and fairly announce the law applicable to the respective theories of the People and the defense.' " *People v. Terry*, 99 Ill. 2d 508, 516 (1984), quoting *People v. Kolep*, 29 Ill. 2d 116, 125 (1963).

It is undisputed in the present appeal that defendant was convicted of aggravated battery of a child and felony murder based on an accountability theory. Accountability is not a crime in and of itself but, rather, a mechanism through which a criminal conviction may result. *People v. Hicks*, 181 Ill. 2d 541, 547 (1998). Section 5—2(c) of the Criminal Code of 1961 (720 ILCS 5/5—2(c) (West 2000)) provides that a person may be held accountable if, "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the

offense." Accountability for felony murder exists only if the defendant may be deemed legally responsible for the felony that accompanies the murder. *People v. Shaw*, 186 Ill. 2d 301, 325 (1998).

In the case at bar, the court instructed the jury using Illinois Pattern Jury Instruction, Criminal, No. 5.03 (3d ed. 1992), (hereinafter IPI Criminal 3d No. 5.03), the standard pattern instruction on accountability. Similarly to section 5—2(c) of the Code, this instruction provides:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of the offense, he *knowingly* solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense." (Emphasis added.) IPI Criminal 3d No. 5.03.

Over defendant's objection, however, the court also instructed the jury using three nonpattern instructions on accountability tendered by the State. Included among these three nonpattern instructions was Instruction No. 10, which told the jury that "a parent has a legal duty to aid a small child if the parent knows or should know about a danger to the child." Based on this nonpattern instruction, the State repeatedly argued to the jury that defendant could be held accountable for the murder of her child if she *should have known* that Scott had been physically abusive to Jami in the past.

A trial court may, in the exercise of its discretion, draft and give nonpattern instructions. *People v. Simms*, 192 Ill. 2d 348, 412 (2000); see also *People v. Swartwout*, 311 Ill. App. 3d 250, 264-65 (2000). The decision to instruct a jury using nonpattern instructions is reviewed for an abuse of discretion. See *People v. Pinkney*, 322 Ill. App. 3d 707, 720 (2000). Whether a court has abused its discretion will depend on whether the nonpattern instruction tendered is an accurate, simple, brief, impartial, and nonargumentative statement of the law.

177 Ill. 2d R. 451(a); *People v. Ramey*, 151 Ill. 2d 498, 536 (1992). As a general rule, where an appropriate IPI instruction exists on a subject upon which the trial court has determined the jury should be instructed, the IPI must be used. *Simms*, 192 Ill. 2d at 412; *People v. Macri*, 185 Ill. 2d 1, 70 (1998). Illinois pattern instructions were "painstakingly drafted with the use of simple, brief and unslanted language so as to clearly and concisely state the law," and, for that reason, "the use of additional instructions on a subject already covered by IPI would defeat the goal that all instructions be simple, brief, impartial and free from argument." *People v. Haywood*, 82 Ill. 2d 540, 545 (1980). Thus, while nonpattern instructions may be given, the instructions, as a whole, must not be misleading or confusing. *People v. Bush*, 157 Ill. 2d 248, 254-55 (1993). Moreover, if conflicting instructions are given, one being a correct statement of law and the other an incorrect statement of law, the error cannot be deemed harmless. *Bush*, 157 Ill. 2d at 254; *People v. Haywood*, 82 Ill. 2d 540, 545 (1980). This is because a jury instructed with contradictory instructions is not given proper guidance and, thus, cannot perform its constitutional function. *People v. Jenkins*, 69 Ill. 2d 61, 67 (1977).

In the case at bar, the State argues that the jury was properly instructed. Conceding, as it must, that accountability requires an intentional or knowing mental state of mind or *mens rea*, the State contends that the jury was correctly instructed on this matter when the trial court, using IPI Criminal 3d No. 5.03, the standard pattern instruction on accountability, told the jury that defendant, to be accountable, had to *knowingly* solicit, aid, abet, agree to aid, or attempt to aid the principal in the commission of the offense. Nonetheless, the State contends that it was necessary to further instruct the jury on a related matter not covered by the pattern

instructions—a parent's legal duty to her child. Relying solely on this court's opinion in *People v. Stanciel*, 153 Ill. 2d 218 (1992), the State contends that Instruction No. 10, which formed the basis for much of its argument to the jury, is an accurate definition of "a parent's legal duty to protect her child from harm" and "has absolutely nothing to do with the mental state" required for holding a parent accountable for murder. We find the State's reliance on *Stanciel* to be misplaced.

In *Stanciel*, this court addressed the consolidated appeals of two mothers (Violetta Burgos and Barbara Peters) who, like defendant in the present case, were each held accountable for her child's murder by a live-in boyfriend. The defendant-mothers each argued that she could not be held accountable for the murder of her child unless it was proved beyond a reasonable doubt that she aided and abetted the commission of an offense with the concurrent *specific intent* to promote or facilitate the commission of that offense. Addressing this argument, we held in *Stanciel* that, to sustain a conviction for murder on an accountability theory, it was sufficient to show that a defendant had the *general intent* to promote or facilitate the commission of the offense, *i.e.*, "that the defendants voluntarily and willfully committed an act, the natural tendency of which is to destroy another's life." *Stanciel*, 153 Ill. 2d at 234. Explaining further, we held that the "intent to promote or facilitate a crime" requirement for accountability could be shown by evidence that a defendant "shared the criminal intent of the principal" or by evidence that there was a "common criminal design." *Stanciel*, 153 Ill. 2d at 234-35. Applying this rule to the facts presented, we decided that there was sufficient evidence that each defendant-mother intended to promote or facilitate the criminal offense that led to her child's death. We held that the mothers' *knowledge* that their children were the victims of an

ongoing pattern of abuse, in conjunction with the mothers' continued sanctioned exposure of the children to this abuse, was sufficient to support the inference that the defendant-mothers shared the principal's criminal intent or that there had been a common criminal design.

After determining in *Stanciel* that the "intent to promote or facilitate" element of accountability had been satisfied, we addressed the second argument advanced by the defendant-mothers—that they could not be held accountable for the murders of their children where there was no evidence that the mothers had voluntarily or knowingly committed any *act* which would have demonstrated that the mothers aided or abetted the criminal offenses which led to their children's deaths. In rejecting this argument, we recognized that parents have a common law duty to protect their children from known threats, such that, under certain conditions, the omission to act will give rise to criminal liability. In the cases under consideration in *Stanciel*, it was determined that the mothers could be found legally responsible for the murders of their children based on their failure to protect their children from what they knew was serious ongoing abuse. We held: "[T]he aid rendered may be found in [the mother's] act of placing [the child] in the control of the principal, a known abuser." *Stanciel*, 153 Ill. 2d at 237. In response to the mothers' expressed concern that the recognition of such a duty would "result in the prosecution of parents for crimes committed upon their children solely by virtue of the common law duty to protect and care for them," we held:

> "Defendant's argument ignores the point that intent is still a requirement, and that guilt must still be proven through the knowledge and sanction of a danger." *Stanciel*, 153 Ill. 2d at 238.

The State, however, points to additional language in *Stanciel* which, it claims, supports the premise that parental duty encompasses what the parent knew or

should have known. Thus, the State contends that Instruction No. 10 and its argument to the jury were accurate statements of the law with regard to parental duty. We disagree.

The language from *Stanciel*, relied upon by the State, is as follows:

"Although both Peters and Burgos argue they did not aid the principals in the pattern of abuse which resulted in the death of the children, the evidence presented against both defendants is sufficient to provide the inference that they both either *knew or should have known of the serious nature of the injuries which the victims were sustaining.*" (Emphasis added.) *Stanciel*, 153 Ill. 2d at 236-37.

It is a misconstruction of *Stanciel* for the State to claim that a parent's legal duty to protect her child may be imposed if she does not know, but should know, of a danger to her child. It is axiomatic that there can be no breach of the duty to act unless there is knowledge of the need for action. The term "knew or should have known" was used in *Stanciel* in reference to the mother's awareness of the severity of the injuries being sustained, not the mother's awareness of the existence of abuse.

Rather than diluting the knowing or intentional *mens rea* requirement for accountability, *Stanciel*, instead, stands for the proposition that when proof that a parent aided and abetted an offense is to be deduced from an omission to act, the parent must know of a serious and immediate threat to the welfare of the child. That is, there must be evidence from which it can be inferred that the parent knew that the child was sustaining injury and, based on the severity of the injuries being sustained, knew that there was a substantial risk that death or great bodily harm would result if the parent did not act to protect the child.

In sum, we conclude that a parent may not sit idly by while another person abuses her child. Parents are required to intercede on their child's behalf and, if they

fail to act, they risk being held responsible for the other person's criminal conduct. By failing to act, the parent may be deemed to have implicitly sanctioned the criminal behavior and, therefore, may be held accountable for the abusive conduct. Even in situations where the parent is not present at the time when the abuse resulting in death takes place, the parent may be held accountable for the criminal conduct resulting in death, if it is proved that the parent knew that the child had been abused by the principal in the past and, because of the nature of previous injuries sustained by the child, also knew there was a substantial risk of serious harm, yet took no action to protect the child from future injury by the abuser.

In the case at bar, the law of accountability was misstated, both in Instruction No. 10 and when the prosecutor repeatedly told the jury throughout the trial that defendant could be held accountable for the offenses charged if she did not know, but should have known, that Scott was abusing Jami. It is clear that the jury was not held to the task of finding beyond a reasonable doubt that defendant possessed the requisite *mens rea* for felony murder predicated on aggravated battery of a child. Because defendant's conviction was premised upon the State's theory that defendant was accountable for the actions of Scott English, accountability was a fundamental element of the offense charged and the error in instruction cannot be deemed harmless. Moreover, in light of the prosecutor's high degree of emphasis on the "should have known" standard, the fact that the jury was also instructed using the IPI standard instruction on accountability does not alter our opinion that reversal is required.

Having decided to reverse defendant's conviction for aggravated battery of a child and, thus, the conviction for felony murder predicated on that felony, we address defendant's challenge to the sufficiency of the evidence

to determine whether remand would subject defendant to double jeopardy. See *People v. Jones*, 175 Ill. 2d 126, 134 (1997); *People v. McDonald*, 125 Ill. 2d 182, 201 (1988). Defendant argues that the evidence, viewed with a correct understanding of the law of accountability, is insufficient to support her conviction for felony murder predicated on aggravated battery. In other words, defendant argues that the evidence presented at trial did not, and could not, establish that she knew Scott was abusing Jami and, accordingly, she did not possess the requisite intent to be held accountable for Scott's conduct which resulted in Jami's death.

A criminal conviction will not be set aside on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that there exists a reasonable doubt of the defendant's guilt. *People v. Maggette*, 195 Ill. 2d 336, 353 (2001). The standard for reviewing a challenge to the sufficiency of the evidence is well settled. When reviewing the sufficiency of the evidence to sustain a verdict on appeal, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis omitted.) *Jackson v. Virginia*, 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89 (1979); *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000); *People v. Thomas*, 178 Ill. 2d 215, 231-32 (1997). The same standard of review applies when reviewing the sufficiency of evidence in all criminal cases, regardless of whether the evidence is direct or circumstantial. *Cooper*, 194 Ill. 2d at 431; *People v. Digirolamo*, 179 Ill. 2d 24, 43 (1997); *People v. Gilliam*, 172 Ill. 2d 484, 515 (1996). Circumstantial evidence alone is sufficient to sustain a conviction where it satisfies proof beyond a reasonable doubt of the elements of the crime charged. See *People v. McDonald*, 168 Ill. 2d 420, 444 (1995).

As our discussion of *Stanciel* makes clear, a parent may be criminally accountable for the murder of her child if there is evidence to support the inference that the parent aided and abetted the commission of the offense, either by acts of commission or omission, while having the concurrent intent to promote or facilitate the offense. The necessary intent element may be shown by evidence that the parent knew that her child was the victim of an ongoing pattern of physical abuse and, while having that knowledge, continued to sanction the abuser's control over the child. Although a defendant's presence during the commission of the offense is not required to prove accountability (*Stanciel*, 153 Ill. 2d at 237; 720 ILCS 5/5—2 (West 2000)), absence is a factor to be considered when deciding whether the defendant possessed the requisite intent.

It is clear from the record that, in the case at bar, defendant was not present when the aggravated battery leading to Jami's death took place. According to the forensic pathologist, Jami died as a result of a massive blow to the head, which caused edema or swelling of the brain, and from asphyxiation. The pathologist believed the blow to Jami's head occurred shortly before Jami's death. This is consistent with Scott's admission that he discovered Jami's lifeless body at about 4:30 a.m. on October 10, 1995, about an hour after he struck Jami near the base of the skull because he found Jami "wriggling" around and getting tangled in her blankets. According to Scott's statement, defendant was not in the room when Scott struck Jami and defendant knew nothing of Scott's conduct until after he confessed to police two days later. The trial judge, who had the benefit of hearing all of the evidence presented at trial, when ruling on a post-trial motion, said, "I think the Court would have to resort to speculation, almost total speculation, to consider this a murder by the defendant as the princi-

pal[;] *** she did not commit the act of killing, nor did she intend to kill the child, nor was she present in the room when her boyfriend killed the child." Certainly, then, there is no proof beyond a reasonable doubt that defendant aided in the commission of the felony or that she was present at the time it was committed.

Having concluded that there is no evidence to support a finding that defendant was present when the aggravated battery took place, the intent element necessary to establish defendant's accountability for murder must be founded on evidence that defendant knew that the principal (Scott) was abusing her child; that defendant knew, from the extent and severity of the injuries sustained by Jami, that there was a substantial risk of serious harm if defendant did nothing to protect her child from the principal (Scott); and, despite this knowledge, continued to permit the principal (Scott) to have access and control over Jami.

In its rebuttal closing argument, the State summarized the evidence which it believed supported defendant's knowledge of abuse, and thus, her conviction by accountability: (1) that in July 1995, Preston had some small scrape marks on his neck, which Preston said were caused by Scott choking him and holding him under water; (2) that Scott, on some unspecified occasion, allegedly kicked Preston in the genital area; (3) that Jami, on an unspecified occasion, had an unexplained line of bruises that went around her head like a headband; (4) that Jami once said Scott tried to choke her; (5) that Jami's grandmother saw a tiny circular bruise on Jami's foot, which Jami said Scott caused by holding her too tightly; (6) that Jami fell down the stairs; (7) that Scott admitted that, on October 7, he grabbed Jami by the neck and "elbowed" her when she stepped on David in the bathtub; and (8) that on October 7 Jami received stitches to her head after falling in the bathroom.

Viewing these incidents, both individually and collectively, we find insufficient evidence to support the inference that, prior to Jami's death, defendant knew Scott was abusing her children or that defendant sanctioned the abuse of her children by Scott. First, there was no evidence that abuse by Scott was the cause of the bruises on Jami's head which were described as a "headband." Nor was there any evidence that Scott was in any way responsible for either of the falls Jami had. Scott's father testified at defendant's trial that he heard a noise and, upon investigation, found Jami at the foot of the stairs. Scott's father also testified, however, that he heard an upstairs door open and then saw Scott come to the top of the stairs to see what had happened. The fall, therefore, was simply a fall. It was not evidence of Jami's abuse by Scott.

The same is true of the fall that resulted in Jami's receiving stitches. Scott adamantly maintained, even after admitting to causing Jami's death, that Jami had fallen off a cookie tin while trying to brush her teeth. There was no evidence presented by the State to show otherwise. Dr. Parungao, who treated Jami for the injury, did not suspect that the injury was the result of abuse, rather than a fall, as reported. The State implies that, because Scott was caring for Jami when the falls occurred, they were evidence of his abuse. But to draw such a conclusion, one must resort to conjecture and speculation. Moreover, even if the falls were a result of Scott's abuse, defendant's awareness of that fact was not established.

The other injuries to defendant's children, cited by the State, did not establish that Scott was engaging in an ongoing pattern of abuse against defendant's children. Nor did the evidence establish that at any time defendant was a witness to Scott abusing her children. Viewing the evidence in a light most favorable to the State, the few

isolated incidents of injury to defendant's children that were linked to Scott's conduct suggest, with the benefit of hindsight, that Scott abused defendant's children. But whenever defendant discovered bruises on her children, she always questioned Scott and received what, at the time, appeared to be plausible explanations for the injuries. Moreover, the injuries sustained by defendant's children were never so extensive or severe that defendant was put on notice that Scott posed a serious threat to her children. This was confirmed by the pathologist, who testified that all of Jami's bruises which were not the result of injuries received in the minutes or hours prior to Jami's death, were not life threatening and could have been attributable to childhood injury. We also find it significant that, after Jami's death, defendant's other two children were examined by a doctor and, despite the fact that both children had some bruises, the doctor did not believe that the children showed signs of abuse.

The circumstances surrounding Jami's death do not suggest that defendant was aware of any foul play. In the early morning hours of October 10, 1995, when Scott discovered that Jami was not breathing, defendant immediately sought medical assistance and began CPR. Even after the paramedics arrived, defendant continued to work frantically to resuscitate Jami. By all accounts, defendant was anxious and concerned while efforts were being made at the hospital to revive Jami. When defendant was told that Jami did not survive, she was distraught and inconsolable. There was no indication that defendant suspected that Jami's death had been due to other than natural causes. Lieutenant Huber testified that when defendant was questioned by police on October 12, 1995, defendant maintained that no one in the English household had ever mistreated her children and, when told that Jami's death had been caused by Scott, defendant appeared genuinely shocked and unable to

comprehend what was being told her. Once defendant learned of Scott's complicity for the murder of her child, she cut off all ties with him and did everything in her power to assist the police in his prosecution.

Although each case must be evaluated on the basis of its own evidence, we note that the facts of the cases in *Stanciel* stand in stark contrast to the facts of the case at bar. In *Stanciel*, one of the mothers, Violette Burgos, had been warned by DCFS to sever all ties with her paramour because of his previous physical abuse of her child. Burgos, however, not only renewed contact with her paramour, she allowed this known abuser to act as the child's disciplinarian. According to both Burgos and her paramour, on the day Burgos' three-year-old daughter died, the paramour "disciplined" the child for urinating on the floor by spanking her until her buttocks were raw. Later that same day, when the child threw up, the paramour punched the child in the stomach and bit her. When the child lost consciousness, Burgos did not seek medical assistance but, rather, carried the child's limp body to Burgos' separate apartment, which she kept to conceal her relationship with the paramour from DCFS. Only when Burgos' attempts to revive the child failed did she call the paramedics. Forensics showed that Burgos had inflicted some of the approximately 21 bite marks found on the child. Furthermore, the autopsy revealed that the blunt force trauma that resulted in the child's death had caused "a ruptured viscus and intestines, as well as injuries to her bowel and liver." There were numerous old bruises and scars, as well as evidence of sexual abuse and a scalding burn on the child's leg. When questioned by police about her child's death, Burgos initially covered up the fact that she had renewed her relationship with her paramour and attributed the fatal injuries to a fall.

In the second case discussed in *Stanciel*, Peters' 20-

month-old son died as a result of bilateral subdural hematomas from blunt trauma. There was evidence that, when the child was less than 18 months old, the child had bruises covering his entire buttocks. In the months that followed, the child sustained bruises on his face, a split lip, and welts across his back. Each time the injuries were attributed to "falls." On one occasion, the child had a "raw and pussy" burn on his leg, which Peters said was caused by the child's clothes rubbing against his skin. On another occasion the child was burned when the paramour "accidentally" spilled hot tea on the child. Although there was evidence that this burn went "from the top of his scalp down his neck and one shoulder," the child was not taken to the hospital, apparently for fear that the paramour would be arrested for abuse. On the day that Peters' child died, a nurse at the hospital overheard Peters tell her paramour, "I told you not to get so angry, I told you not to get so angry, I told you this would happen." The child's autopsy revealed that "based upon the autopsy, the constellation of injuries, the varying ages of the injuries, and [the child's] pediatrician's records, [the child's] physical condition at the time of autopsy was 'the direct result of on-going abuse.' " *Stanciel*, 153 Ill. 2d at 228. Further, when questioned by police, Peters indicated that she thought her paramour was responsible for her child's death, that she had not really wanted the boy, and she did not really care what happened to him.

In concluding that the facts of these cases supported the inference that the defendant-mothers shared the principals' intent, we held that the defendant-mothers' knowledge of injuries to the children, which were both extensive and severe, indicated that the mothers had knowledge of the ongoing abuse of their children and this knowledge, coupled with the mothers' continued, sanctioned exposure of the children to this abuse, was

sufficient to hold the defendant-mothers accountable for the murder of their children. *Stanciel*, 153 Ill. 2d at 232. In other words, a reasonable inference to be drawn from the facts of these cases was that the mothers shared the intent of the principals.

In the case at bar, the evidence does not establish that defendant intended to promote or facilitate the aggravated battery which caused Jami's death. The evidence simply does not support the inference that Jami was the victim of an ongoing pattern of abuse that the mother knew about and sanctioned. After reviewing all of the evidence presented at defendant's trial in this case, we are convinced that no rational jury, given proper guidance regarding the law of accountability, could find beyond a reasonable doubt that defendant is accountable for the murder of her daughter, Jami.

Because we find there is insufficient evidence to support defendant's conviction for aggravated battery, we need not consider the argument raised in defendant's supplemental brief, that a conviction for aggravated battery can never support a felony-murder conviction.

## CONCLUSION

For these reasons stated, we reverse defendant's convictions without remand.

*Reversed.*

JUSTICE RARICK took no part in the consideration or decision of this case.

JUSTICE THOMAS, concurring in part and dissenting in part:

I agree with the majority that the law of accountability was misstated so that defendant's convictions for aggravated battery of a child and for felony murder based upon a theory of accountability must be reversed. I write separately, however, because I disagree with the majori-

ty's conclusion that, viewing the evidence under a proper theory of accountability, the evidence at defendant's trial was not sufficient to support defendant's convictions.

A criminal conviction should not be set aside unless the evidence is so improbable, unreasonable or unsatisfactory as to justify a reasonable doubt concerning the defendant's guilt. *People v. Maggette*, 195 Ill. 2d 336, 353 (2001). A reviewing court should not substitute its judgment for that of the trier of fact with regard to the weight of the evidence and the credibility of witnesses. *People v. Kotlarz*, 193 Ill. 2d 272, 298 (2000). Although the evidence in this case certainly was closely balanced, the evidence was not so improbable, unreasonable or unsatisfactory that no rational jury could convict defendant.

As the majority notes, in order to hold defendant accountable for Scott English's conduct, the evidence must show that defendant knew that Scott was abusing Jami, that there was a substantial risk of serious harm if defendant did nothing to protect Jami from Scott, and despite this knowledge, that defendant continued to permit Scott to have access and control over Jami. I believe there is evidence to support such a conclusion.

The evidence at trial included testimony that there were more than 100 bruises in various stages of healing on Jami's body, the oldest of which were at least one week old. There were 13 distinct hemorrhagic injuries to Jami's skull, eight of which were three to four days old. The defendant's mother, her sister, a friend and a babysitter testified that they had observed bruises on defendant's children only after defendant moved in with Scott. With regard to the incident where Preston claimed that Scott had choked him and held him under water, defendant's sister, Sue Ostrowski, testified that Preston had marks on his neck that looked like finger marks. Sue recalled that defendant brought Preston to her mother's house to show her the injury and to ask her mother's

opinion about how Preston could have sustained such an injury. In addition, defendant once brought Jami to Sue's house to ask Sue's opinion of how Jami could have sustained an injury to her ear and neck. Scott had told defendant that those injuries were sustained when Jami fell down the stairs. Sue, however, told defendant that Jami's injuries did not appear to be of the type that would result from falling down the stairs.

Defendant's mother, Sandra Pollock, also testified at trial that Preston told defendant that Scott had choked him and held him under water. On another occasion, Jami told Sandra that Scott had caused an injury to her foot when he held her foot very tightly. When Sandra told defendant about the injury to Jami's foot, defendant told Sandra that Jami was making up the story. With regard to the injuries that Jami allegedly sustained in a fall down the stairs, Sandra did not believe that the injuries were the result of a fall. When Sandra confronted defendant about those injuries, defendant told Sandra that Scott's parents had confirmed the story about a fall.

Leslie Huber testified at trial that she baby-sat for defendant's children. Leslie testified that a few weeks before the murder, Jami told her mother in Leslie's presence that Scott had choked her. When Leslie asked defendant if she heard Jami, defendant told Leslie that Jami could be making up the choking story. Five days before Jami's death, Leslie saw bruises on Jami's head running across her hairline and saw a red, knotted mark on Jami's forehead. Defendant asked Leslie's mother, Sue Huber, to look at the marks on Jami's head. Defendant told Sue she did not know what had caused those marks.

Sherry Ranos, a criminal investigator with the Illinois State Police, testified that she had interviewed defendant after Jami's death. With regard to the incident where Scott told defendant that Jami had fallen down

the stairs, defendant told Ranos that she did not believe the marks on Jami's body were the result of falling down the stairs. Defendant also told Ranos that three days before Jami's death, Jami had three separate "accidents" in one day: (1) the incident where Scott "accidentally" grabbed Jami by the neck; (2) the incident where Scott "accidentally" pushed Jami in the bathtub, causing her to fall backward and hit her head; and (3) the incident where Jami fell in the bathroom and required stitches to her head. Defendant also revealed that Jami told defendant that Scott was mean.

In addition to the foregoing evidence, portions of defendant's grand jury testimony were read into evidence at trial. Defendant had testified before the grand jury that she did not believe Scott's story concerning how Preston had received his neck injuries, so she brought Preston to her mother for a second opinion. While she was at her mother's home, defendant learned from Preston that Scott had choked him and tried to drown him. Defendant also testified that after Jami allegedly fell down the stairs, defendant asked her mother and her sister their opinion concerning the accident. Defendant's sister told defendant that the injuries looked "kind of funny" for falling down the stairs. At trial, defendant acknowledged that Jami's injuries occurred only when defendant was away from the home.

I believe the foregoing evidence is sufficient to create a question for the trier of fact as to whether defendant knew Scott was abusing Jami. The injuries to defendant's children first occurred after defendant moved in with Scott. In addition, Jami and Preston told defendant that Scott had choked them. Although defendant testified that Scott had explanations for all of the injuries to her children, defendant nonetheless was suspicious enough that she asked her mother, her sister, and Sue Huber for their opinions concerning the various injuries. Based

upon this evidence, I believe a rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could have found defendant guilty beyond a reasonable doubt. In any event, given the closeness of the evidence, a determination concerning defendant's guilt under the proper theory of accountability is better left to the trier of fact. Accordingly, I dissent from the majority's finding that this case need not be remanded for a new trial.

JUSTICE GARMAN joins in this partial concurrence and partial dissent.