# Illinois Official Reports

## Appellate Court

---

### *People v. Pollock*, 2014 IL App (3d) 120773

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TABITHA POLLOCK, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-12-0773 |
| Filed<br>Rehearing denied | October 15, 2014<br>November 17, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where defendant was found guilty of aggravated battery and felony murder of her daughter but her conviction was reversed by the Illinois Supreme Court based on the finding that there was insufficient evidence to support the inference that defendant knew, before the child's death, that defendant's boyfriend was abusing the daughter, the trial court's denial of defendant's petition for a certificate of innocence pursuant to section 2-702 of the Code of Civil Procedure was affirmed, since a finding of "not guilty" is not the legal equivalent of a finding that defendant was "innocent," especially when, as in defendant's case, there was evidence that the daughter told defendant that the boyfriend choked her, the daughter had more than 100 bruises on her body yet defendant denied seeing any injuries when she bathed the child the day before she died, and there was circumstantial evidence that defendant knew there was "substantial risk" of serious harm to the child but she did not take any action to protect the child. |
| Decision Under Review | Appeal from the Circuit Court of Henry County, No. 95-CF-317; the Hon. Charles H. Stengel, Judge, presiding. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Jane E. Raley, of Northwestern University Legal Clinic, and Karen L. Daniel, of Bluhm Legal Clinic, both of Chicago, and Lawrence C. Marshall (argued), of Stanford Law School, of Stanford, California, for appellant. |
| | Terence M. Patton, State's Attorney, of Cambridge (Richard T. Leonard (argued), of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE SCHMIDT delivered the judgment of the court, with opinion. Presiding Justice Lytton specially concurred, with opinion. Justice McDade dissented, with opinion. |

## OPINION

¶ 1     A Henry County jury convicted defendant, Tabitha Pollock, of aggravated battery and felony murder of her 3½-year-old daughter. This court affirmed. *People v. Pollock*, 309 Ill. App. 3d 400 (1999). A divided panel of our supreme court found "insufficient evidence to support the inference that, prior to [the daughter's] death, [defendant] knew [her paramour] was abusing her children." *People v. Pollock*, 202 Ill. 2d 189, 220 (2002). As such, the court reversed Pollock's conviction without remand. *Id*. at 224.

¶ 2     Following the reversal, Pollock filed a petition for a certificate of innocence pursuant to section 2-702 of the Illinois Code of Civil Procedure (the Code) (735 ILCS 5/2-702 (West 2008)). The matter proceeded to a hearing, after which the circuit court denied Pollock's petition. She appeals. We affirm.

¶ 3                                                BACKGROUND

¶ 4     Evidence adduced at Pollock's trial indicated that in the early morning hours of October 10, 1995, emergency personnel responded to a call from the home in which Pollock lived with her boyfriend, Scott English. Also residing in the home were Pollock's three children, English's parents, the girlfriend of English's brother and the girlfriend's child. Upon arrival, emergency personnel found Pollock's 3½-year-old daughter lying unresponsive on the floor in a bedroom with Pollock attempting to perform cardiopulmonary resuscitation.

¶ 5     Efforts to revive the child proved unsuccessful. The treating physician, who informed Pollock that her daughter was dead, testified at trial. He noted that he had sutured a laceration on the daughter's head a few days before her death. He did not suspect foul play at the time of the sutures, but when the daughter was brought in unresponsive, he did suspect inappropriate behavior and instructed the nurse to document the victim's injuries.

¶ 6    The attending nurse testified that she noted 11 injuries, 10 of which could indicate abuse. The nurse noted numerous bruises on the victim. The forensic pathologist who conducted the child's autopsy determined the cause of death to be blunt force trauma and asphyxiation. The pathologist observed over 100 bruises in various stages of healing on the victim's body. The oldest injury appeared to be, at most, two weeks old and the freshest made minutes or hours before her death.

¶ 7    The pathologist found 13 distinct hemorrhagic injuries on the child's skull. Eight of these injuries were three to four days old. An internal examination revealed more extensive bruising of the victim's chest, abdomen and head.

¶ 8    When questioned by the police, Pollock denied ever striking the victim or knowing about any abuse the victim may have previously suffered. She stated that she had noticed injuries to her children in the weeks preceding the victim's death. She noticed marks on her son's neck; her son told her that the marks were the result of English choking him. She stated, however, English informed her that he had mistakenly grabbed the boy around the neck when the boy began to fall.

¶ 9    Pollock described a similar incident to the police where English informed her that her daughter attempted to get into the bathtub with another child. During this incident, English pushed the daughter, causing the daughter to slip and fall and resulting in the daughter being bruised.

¶ 10    Pollock described other incidents where she found bruising on the victim's face that she attributed to falls. English told Pollock that her daughter had been injured when she fell down the stairs and into a chair at the bottom. Days before the victim's death, Pollock returned home to find that the victim had supposedly fallen off a stool while trying to reach the toothpaste on the bathroom counter. That fall resulted in stitches to the child's head. Pollock stated that her daughter described English as mean.

¶ 11    Pollock acknowledged bathing the victim on October 9, 1995, the day before the paramedics were called to the residence. When asked if she observed any of the 100 injuries described by the pathologist, Pollock stated, "I wouldn't say she had a lot of injuries. She had a few different things here and there."

¶ 12    Both Pollock's mother and sister testified at trial. They noticed bruises on all of Pollock's children after she moved in with English. They relayed stories the children would tell about Pollock's boyfriend choking them. Pollock's mother testified that the victim took off her shoe and sock to display a bruise on her foot. The victim told her it was from English squeezing her foot too tightly. Pollock's mother acknowledged confronting Pollock with the victim's version of the events that led to the injured foot. Pollock dismissed the accusations as "made up," yet Pollock's mother stated during the exchange that "I don't think she made this up."

¶ 13    Pollock's friend, Leslie Huber, testified that a couple of weeks before the victim's death, she was riding in a car with Pollock and the victim. The victim specifically told Pollock, "Scott choked me." Huber asked Pollock if she had heard what the victim said. Pollock responded in the affirmative, but stated that the victim was likely "making it up."

¶ 14    Huber and Huber's mother testified that approximately five days before the victim's death, they observed large bruises across the victim's forehead. When discussing the bruises with Pollock, she claimed the victim obtained the bruises by getting her head stuck in a bed's headboard.

¶ 15    The State adduced additional evidence at Pollock's trial suggesting that Pollock had a history of failing to protect her children from abuse. In August of 1994, Pollock brought the victim to a medical clinic in Galva, Illinois, for immunization. When the nurse-practitioner attempted to examine the victim, Pollock became upset. The nurse-practitioner noted a red, swollen area around the right eye of the victim, as well as a dark purple contusion on her upper ear. The victim also had a bruise the size of an adult thumb on her left arm.

¶ 16    When questioned, Pollock explained away these injuries as insect bites. The nurse-practitioner did not believe insect bites could cause such injuries so she reported the incident to the Department of Children and Family Services (DCFS), which subsequently found the report to be "indicated." DCFS notified Pollock that an indicated report had been filed due to environmental neglect, medical neglect and risk of harm due to cuts, bruises and welts.

¶ 17    Belinda Garvin testified that in March or April of 1995, Garvin observed Pollock striking the victim in the head and kicking the victim in the back. Another witness, Angela Nordstrom, testified that she, too, observed Pollock strike the victim in the head. This occurred in May of 1995. Nordstrom told Pollock she should not strike the victim in such a manner.

¶ 18    In April of 1995, approximately six months prior to the victim's death, Rachel Wiegand reported Pollock to DCFS for bruises she observed on the victim. Wiegand offered to keep and care for the victim, but Pollock declined the offer, stating that she would get into trouble with public aid. As a result of the report, a DCFS investigator went to Pollock's residence to find a padlock on the door. The next day, a police officer approached Pollock, who informed him that she would not be available to DCFS for at least four more days. Thereafter, Pollock informed DCFS that she would not cooperate with any investigation.

¶ 19    Regarding the night that the victim received her fatal injuries, English gave a statement to the police in which he admitted striking the victim in the head shortly before she was found dead. He informed the police that the victim had recently begun winding herself up in her blanket as she slept. That night, he found her asleep with her blanket wound around her. He claimed to have struck her in the back of the head to make her stop winding herself in the blanket. When he checked on the victim a while later, he noticed she was not breathing and carried her into the room he shared with Pollock.

¶ 20    According to Pollock, English arrived home at 12:40 a.m. that night. Sometime after his arrival, she noticed the kids "were a little restless." She went to check on them and found English at the foot of their bed telling them to go back to sleep. She immediately left the bedroom and stood outside the door out of fear that the kids would wake up if they saw her. English went downstairs to get something to eat, which he brought back to their bedroom. After he ate, they each took a shower. Pollock noted when English returned after taking his shower, he informed her that he just checked on the children and they were fine.

¶ 21    The two watched television until 3 or 3:30 a.m., after which English, again, checked on the children. Upon returning, he informed Pollock that the victim had been wrapped in her blanket and he fixed it. Later, around 5 a.m., Pollock was awakened by English, who informed her that the victim was not breathing.

¶ 22    As noted above, a divided panel of our supreme court reversed Pollock's conviction without remand. *Pollock*, 202 Ill. 2d at 224. Thereafter, she filed a certificate of innocence pursuant to section 2-702 of the Code. 735 ILCS 5/2-702 (West 2008). At a hearing on the merits, the parties agreed to base their arguments on the evidence presented at trial. On

September 4, 2012, the trial court issued a written order denying the petition. The order found that Pollock failed to prove by a preponderance of the evidence that she was actually innocent of the charges filed against her.

¶ 23                                                    ANALYSIS

¶ 24     The sole question presented for review is whether the trial court properly denied Pollock's petition for a certificate of innocence. The main thrust of Pollock's argument is that a finding by the supreme court majority on direct appeal that the State failed to prove its case entitles her to a certificate of innocence. Section 2-702(b) of the Code provides that "[a]ny person convicted and subsequently imprisoned for one or more felonies by the State of Illinois which he or she did not commit may, under the conditions hereinafter provided, file a petition for certificate of innocence in the circuit court of the county in which the person was convicted. The petition shall request a certificate of innocence finding that the petitioner was innocent of all offenses for which he or she was incarcerated." 735 ILCS 5/2-702(b) (West 2008).

¶ 25     In order to obtain a certificate of innocence under section 2-702 of the Code, a petitioner must prove by a preponderance of the evidence:

> "(1) the petitioner was convicted of one or more felonies by the State of Illinois and subsequently sentenced to a term of imprisonment, and has served all or any part of the sentence;
>
> (2) (A) the judgment of conviction was reversed or vacated, and the indictment or information dismissed or, if a new trial was ordered, either the petitioner was found not guilty at the new trial or the petitioner was not retried and the indictment or information dismissed; ***
>
> (3) the petitioner is innocent of the offenses charged in the indictment or information ***; and
>
> (4) the petitioner did not by his or her own conduct voluntarily cause or bring about his or her conviction." 735 ILCS 5/2-702(g) (West 2008).

¶ 26     "If the court finds that the petitioner is entitled to a judgment, it shall enter a certificate of innocence finding that the petitioner was innocent of all offenses for which he or she was incarcerated." 735 ILCS 5/2-702(h) (West 2008). "Whether or not a petitioner is entitled to a certificate of innocence is generally committed to the sound discretion of the court." *Rudy v. People*, 2013 IL App (1st) 113449, ¶ 11. The First District has stated that "the plain language of section 2-702 shows the legislature's intent to distinguish between a finding of not guilty at retrial and actual innocence of the charged offenses." *People v. Fields*, 2011 IL App (1st) 100169, ¶ 19.

¶ 27     Pollock claims we review this case *de novo*. We disagree. Section 2-702(a) of the Code specifically states that the court shall exercise "its *discretion* as permitted by law regarding the *weight* and admissibility of evidence" when determining whether a petitioner is entitled to a certificate of innocence. (Emphases added.) 735 ILCS 5/2-702(a) (West 2008). We, therefore, find that our standard of review is abuse of discretion. "An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera*, 2013 IL 112467, ¶ 37. Reasonable jurists might conclude that since this is a factual issue, we should review under a manifest weight of the evidence standard. A decision is against the manifest weight of the evidence only

when the opposite conclusion is clearly evident. *Carrillo v. Park Ridge Firefighters' Pension Fund*, 2014 IL App (1st) 130656, ¶ 21. At least in this case, the difference between abuse of discretion and manifest weight of the evidence is virtually metaphysical. The analysis is the same. We look to see whether there was evidentiary support for the judge's decision. Without evidentiary support, the trial court's decision would be against the manifest weight of the evidence; the opposite conclusion would be clearly evident. No reasonable person would agree with it.

¶ 28    Pollock claims that the trial court erred in finding she failed to prove by a preponderance of the evidence that she is actually innocent of the offense charged. She claims English's confession "exonerates [her] of the offenses charged." She claims her testimony that she was sleeping at the time of the offense and observed no prior evidence that English was abusing her kids is additional evidence which supports her claim of actual innocence.

¶ 29    The State acknowledges that Pollock proved the first, second and fourth elements of section 2-702(g). The parties quarrel over whether Pollock met her burden of proving the third element, actual innocence.

¶ 30    In *Pollock*, our supreme court noted:

"In sum, we conclude that a parent may not sit idly by while another person abuses her child. Parents are required to intercede on their child's behalf and, if they fail to act, they risk being held responsible for the other person's criminal conduct. By failing to act, the parent may be deemed to have implicitly sanctioned the criminal behavior and, therefore, may be held accountable for the abusive conduct. Even in situations where the parent is not present at the time when the abuse resulting in death takes place, the parent may be held accountable for the criminal conduct resulting in death, if it is proved that the parent knew that the child had been abused by the principal in the past and, because of the nature of previous injuries sustained by the child, also knew there was a substantial risk of serious harm, yet took no action to protect the child from future injury by the abuser." *Pollock*, 202 Ill. 2d at 215-16.

¶ 31    We could just point to the dissenting opinion in *Pollock* (*id.* at 224-28 (Thomas, J., concurring in part and dissenting in part, joined by Garman, J.)) to resolve this issue. The dissent explains why the evidence at trial was sufficient for a jury to find Pollock guilty beyond a reasonable doubt. However, we point out some of the facts that demonstrate the trial court did not abuse its discretion in finding that Pollock did not meet her burden of establishing actual innocence.

¶ 32    As noted above, Huber testified that she was riding in a car with Pollock and the victim a couple weeks before the murder when the victim specifically told Pollock that Scott choked her. Huber asked Pollock if she had heard what the victim said. Pollock responded that she had heard what the victim said, but believed the victim to be making up the story.

¶ 33    Pollock denied that the conversation ever took place. It is not for this court to determine the veracity of Pollock's denial. We must simply determine if the trial court abused its discretion when finding that Pollock failed to prove her innocence by a preponderance of the evidence.

¶ 34    The evidence below indicates that Pollock's 3½-year-old daughter told her that Pollock's paramour choked her. Pollock's friend witnessed the conversation and ensured that Pollock heard the daughter's statement. The daughter had more than 100 bruises on her 40-month-old frame, literally from her head to her toes. These bruises and injuries were, at most, two weeks

old. Pollock acknowledged bathing the victim the day before she died, yet denied seeing any injuries that gave her pause. There was ample circumstantial evidence that Pollock "knew there was a substantial risk of serious harm, yet took no action to protect the child from future injury by the abuser." *Id.* at 216. We cannot say that the trial court abused its discretion when finding that Pollock failed to prove her innocence by a preponderance of the evidence. Likewise, the trial court's ruling is not against the manifest weight of the evidence. The dissent argues that our standard of review is *de novo*. *Infra* ¶¶ 55-59. Assuming, *arguendo*, that it is *de novo*, for the reasons set forth herein, the result is the same.

¶ 35    Finally, Pollock claims our supreme court declared her actual innocence, as contemplated by section 2-702 of the Code, when stating, "no rational jury, given proper guidance regarding the law of accountability, could find beyond a reasonable doubt that defendant is accountable for the murder of her daughter, Jami." *Pollock*, 202 Ill. 2d at 224. Again, we disagree. This argument is simply untenable as it equates a finding that the State failed to prove its case to actual innocence. Had the legislature meant this to be the rule, it would have so said.

¶ 36    In *People v. Fields*, 2011 IL App (1st) 100169, the trial court found defendant guilty of murder and sentenced him to death. *Id.* Defendant filed a postconviction petition, which was granted, and the case proceeded to a second trial. *Id.* At the second trial, the trial court entered a verdict of not guilty, finding the State failed to prove the defendant guilty beyond a reasonable doubt. *Id.* ¶ 8. The defendant then petitioned for a certificate of innocence which the trial court granted. *Id.* ¶ 9. The First District reversed. *Id.* ¶ 20.

¶ 37    Interpreting section 2-702 of the Code, the *Fields* court noted that "the plain language of section 2-702 shows the legislature's intent to distinguish between a finding of not guilty at retrial and actual innocence of the charged offenses." *Id.* ¶ 19. We agree with the First District's interpretation of section 2-702 and similarly find that the Code contemplates the differences between actual innocence and a finding by a court of review that no rational jury could find beyond a reasonable doubt that the State proved all elements of the crimes charged. Any other interpretation ignores the language in section 2-702, which requires the trial court to exercise its discretion. Until the legislature declares otherwise, "not guilty" is not the legal equivalent of "innocent." We find no error in the trial court's denial of the petition for certificate of innocence.

¶ 38                                CONCLUSION
¶ 39    For the foregoing reasons, the judgment of the circuit court of Henry County is affirmed.

¶ 40    Affirmed.

¶ 41    PRESIDING JUSTICE LYTTON, specially concurring.
¶ 42    I agree that the denial of the petition for certificate of innocence should be affirmed. I write separately to clarify the standard of review and to disclaim the use of the majority author's citation to the dissent in *People v. Pollock*, 202 Ill. 2d 189 (2002).

¶ 43    In this case, our standard of review is abuse of discretion. 735 ILCS 5/2-702(a) (West 2008); *Rudy v. People*, 2013 IL App (1st) 113449, ¶ 11 (certificate of innocence committed to the sound discretion of the trial court (citing *Betts v. United States*, 10 F.3d 1278, 1283 (7th Cir. 1993))). It is not manifest weight of the evidence.

¶ 44    The analysis here is simple. In *Pollock*, our supreme court determined there was insufficient evidence to convict Pollock of felony murder. *Pollock*, 202 Ill. 2d at 220. Under the certificate of innocence statute, petitioner must prove herself innocent, not just "not guilty." See 735 ILCS 5/2-702 (West 2008). In denying Pollock's petition, the trial court relied on the evidence before it showing that she knew there was a substantial risk of serious harm and did not act to protect her child. The court's decision was not an abuse of discretion. We should affirm on that basis. The majority author reaches the same conclusion but cites the dissent in *Pollock* as support. The dissent in that case believed there was sufficient evidence to convict defendant; it did not concern itself with whether Pollock proved the requirements for a certificate of innocence. The reference to the dissent is immaterial and unnecessary.

¶ 45    JUSTICE McDADE, dissenting.

¶ 46    The majority affirms the decision of the circuit court of Henry County denying Tabitha Pollock's petition for a certificate of innocence sought pursuant to section 2-702 (735 ILCS 5/2-702 (West 2008)). In affirming, the majority finds that our standard of review in this case is whether the trial court abused its discretion in denying the petition and concludes that it did not.

¶ 47    Citing to *People v. Fields*, 2011 IL App (1st) 100169, the majority finds a clear legislative intent to distinguish between a finding of not guilty and a determination of innocence, and holds that the decision of the supreme court reversing Pollock's conviction does not equate to a finding of innocence.

¶ 48    I agree that there is a legislative intent to distinguish between "not guilty" and "innocent," but sometimes they are the same. For the reasons that follow, I believe the supreme court's decision in this case does equate to a finding of innocence and, therefore, respectfully dissent.

¶ 49    I begin by noting that the statute provides no definition of "innocence," and I confess to some uncertainty about precisely what that word means within the statutory context.

¶ 50    We are not mind readers or soothsayers or psychologists or religious clerics; we are a court of law. It, therefore, seems eminently reasonable to me that any determination we make regarding actual innocence of the crime with which the petitioner was charged has to be grounded in the law and procedures that we are trained and equipped to implement. There has to be some principled analytical framework for assessing legal innocence or we risk being inconsistent, erratic, and quixotic in deciding when and why a petition for a certificate of innocence is approved or denied.

¶ 51    If we follow the model implied in the majority's decision, the trial court looks at the evidence and decides, based on some personal concept or interpretation of what would constitute innocence in the particular case and, in an exercise of discretion, grants or denies the certificate of innocence. Had the case been assigned to a different judge, the outcome may have been exactly opposite. On appeal in either event, our standard of review would be whether the trial court abused its discretion–a highly deferential standard–and the decision, whichever way it went and however it was reached, would probably be affirmed.

¶ 52    It seems clear from the language of the statute that the decision to grant or deny the certificate of innocence is case specific and is significantly impacted by its procedural history and posture. As has been set out by the majority, a successful petitioner must meet four requirements:

"(g) In order to obtain a certificate of innocence the petitioner must prove by a preponderance of evidence that:

(1) the petitioner was convicted of one or more felonies by the State of Illinois and subsequently sentenced to a term of imprisonment, and has served all or any part of the sentence;

(2) (A) the judgment of conviction was reversed or vacated, and the indictment or information dismissed or, if a new trial was ordered, either the petitioner was found not guilty at the new trial or the petitioner was not retried and the indictment or information dismissed; or (B) the statute, or application thereof, on which the indictment or information was based violated the Constitution of the United States or the State of Illinois;

(3) the petitioner is innocent of the offenses charged in the indictment or information or his or her acts or omissions charged in the indictment or information did not constitute a felony or misdemeanor against the State; and

(4) the petitioner did not by his or her own conduct voluntarily cause or bring about his or her conviction." 735 ILCS 5/2-702(g) (West 2008).

¶ 53    The State has conceded that Pollock has met the first, second and fourth requirements, the trial court and the majority have agreed and it is also clear to me that its concession is warranted.

¶ 54    Pollock was convicted of first degree (felony) murder (720 ILCS 5/9-1(a)(2), (a)(3) (West 1994)) and, on a theory of accountability, aggravated battery of a child (720 ILCS 5/12-4.3(a) (West 1994)). The aggravated battery served as the predicate offense for the felony murder conviction. She was sentenced to 36 years' imprisonment and served 7 years before being released when her conviction was reversed by the supreme court without remand. *People v. Pollock*, 202 Ill. 2d 189 (2002). Pollock did nothing to voluntarily cause or bring about her conviction. Therefore, I agree with the majority that our analysis focuses solely on the third requirement.

¶ 55    Before discussing whether Pollock has satisfied that requirement, I would like to weigh in on the proper standard of review. The statute says:

"It is the intent of the General Assembly that the court, in exercising its discretion as permitted by law *regarding the weight and admissibility of evidence submitted pursuant to this Section, shall, in the interest of justice, give due consideration to difficulties of proof caused by the passage of time, the death or unavailability of witnesses, the destruction of evidence or other factors not caused by such persons or those acting on their behalf.*" (Emphasis added.) 735 ILCS 5/2-702(a) (West 2008).

¶ 56    This language defining the court's exercise of discretion permits varying the standard of review in a way that is consistent with prior precedent of the supreme court–that is, in circumstances where no new evidence has been heard and the trial judge did not preside over the earlier procedure and has no special knowledge of the case that this court cannot glean from the record, our standard of review should be *de novo.*

¶ 57    Pollock notes that the trial court "resolved no factual disputes, made no credibility findings and had no special expertise or familiarity with the original trial." She cites three recent cases in which the supreme court found it appropriate to vary the standard from abuse of discretion to *de novo*: *People v. English*, 2013 IL 112890, ¶ 24 (postconviction petition), *People v. Vincent*,

226 Ill. 2d 1, 15-18 (2007) (section 2-1401 petition), and *People v. Caballero*, 206 Ill. 2d 65, 87-88 (2002) (postconviction petition). While acknowledging that none of the three cases deals with a certificate of innocence, she asserts that these cases support her argument for *de novo* review and urges us to apply that standard in the current situation. I find Pollock's argument persuasive.

¶ 58    The argument for *de novo* review seems even more compelling in this case where the supreme court analyzed the very same facts reviewed by the trial court and made specific findings diametrically opposed to those made by the trial judge here and relied upon by the majority. There was no evidence submitted to the trial court that had not already been carefully and exhaustively considered and ruled upon by the supreme court. I would find that the proper standard for reviewing the appeal in this case is *de novo.*

¶ 59    Even if our standard were abuse of discretion, we would have to find it satisfied. In its order, the trial court says "the Supreme Court stated the rule of law regarding the *mens rea* requirement for accountability." It then quoted the rule, which in its pertinent part set out three things that must be proven to hold a parent who was not present when the abuse occurred and whose culpability is grounded in omissions, rather than commissions, accountable for the resulting death:

> "[T]he parent may be held accountable for the criminal conduct resulting in death if it is proved that [1] the parent knew that the child had been abused by the principal in the past and, [2] because of the nature of previous injuries sustained by the child, also knew there was a substantial risk of serious harm, [3] yet took no action to protect the child from future injury by the abuser. *Pollock*, 202 Ill. 2d 189."

¶ 60    After quoting this test, the trial court ignored it and considered only one of the factors, made findings contradictory to the supreme court's decision, and reached its conclusion:

> "Looking at all the facts and circumstances of this case, *the issue boils down to whether the defendant knew that her children had been abused in the past by Scott English.* *** [T]he court has to look to what evidence the defendant had that Scott had abused her children. Given that both Jami and Preston had told the defendant that Scott English had choked them, given the finger marks on Preston's back and given the close proximity of the injuries on Jami from the alleged fall down the stairs, being choked and falling in the bathroom, I find that the defendant has not proved by a preponderance that she is actually innocent of the crime. Therefore I deny the Petitioner's Petition." (Emphasis added.)

¶ 61    The trial court's order raises the final threshold question that I believe we need to resolve–that is, what role does the supreme court's decision in *Pollock* play in our review of the trial court's decision denying the petitioner a certificate of innocence?

¶ 62    Pollock argues that the decision meets the parameters of the doctrines of both law of the case and collateral estoppel. Generally, law of the case operates to preclude the relitigation–in later proceedings in the same case–of findings of fact and conclusions of law made by a reviewing court. *Bjork v. Draper*, 404 Ill. App. 3d 493, 501 (2010). Collateral estoppel, however, applies to estop persons from relitigating an issue which has already been decided in a prior case, so long as the issues are identical, the party sought to be estopped or his privy was a party to the earlier litigation, and there was a final judgment on the merits in the prior case. *American Family Mutual Insurance Co. v. Savickas*, 193 Ill. 2d 378, 387 (2000). Although the spirit of both doctrines would suggest their application in the present case could be appropriate,

I believe that the supreme court's decision is the law of the case and it would preclude contrary findings of fact or law in deciding whether or not Pollock should be granted a certificate of innocence.

¶ 63      The State appears to suggest that the supreme court's decision is not binding on the trial court in the instant matter because both the issue and the allocation of the burden of proof are different. The same is true of a decision on a motion to quash arrest and suppress evidence where (1) the issue is not the defendant's guilt but the propriety of the seizure and (2) the defendant, not the State, carries the burden of proof. Yet we do not argue these proceedings are not part of the case. I would find no obstacle to recognizing the supreme court's decision as law of the case.

¶ 64      I do not read the majority as suggesting that the *Pollock* opinion has no pertinence here, but only that its holding does not answer the question of Pollock's actual innocence. The author has characterized the court's decision as "[a] divided panel of our supreme court [finding] 'insufficient evidence to support the inference that, prior to [the daughter's] death, [defendant] knew [her paramour] was abusing her children' " (*supra* ¶ 1) and "[t]his argument [that the supreme court declared her actual innocence] is simply untenable as it equates a finding that the State failed to prove its case to actual innocence" (*supra* ¶ 35). The concurring judge said: "In *Pollock*, our supreme court determined there was insufficient evidence to convict Pollock of felony murder." *Supra* ¶ 44.

¶ 65      While I agree the court did make those findings, it did far more than that. Its decision demonstrated that Pollock was innocent under the statute.

¶ 66      There are five elements in the decision that support this conclusion. The first concerns Pollock's challenge to the non-Illinois Pattern Jury Instruction (IPI) given to the jury that allowed jurors to substitute a negligence standard (knew or should have known) for the specific intent standard (knew) that is required to prove aggravated battery on the basis of accountability. In discussing that challenge, the court stated:

> "[W]hen proof that a parent aided and abetted an offense is to be deduced from an omission to act, the parent must know of a serious and immediate threat to the welfare of the child. That is, there must be evidence *from which it can be inferred* that the parent knew that the child was sustaining injury and, based on the severity of the injuries being sustained, knew that there was a substantial risk that death or great bodily harm would result if the parent did not act to protect the child.
>
> * * *
>
> *** [A] parent may be criminally accountable for the murder of her child if there is *evidence to support the inference* that the parent aided and abetted the commission of the offense, either by acts of commission or omission, while having the concurrent intent to promote or facilitate the offense." (Emphases in original.) *Pollock*, 202 Ill. 2d at 215-18.

Both of these statements make it clear that criminal accountability is an *inference*, which requires the defendant's actual knowledge.

¶ 67      The court concluded that giving the non-IPI instruction was error, that the error was not harmless and that both of Pollock's convictions (for aggravated battery and felony murder predicated on that battery) must be reversed on that basis alone. Because the dissent agreed with this conclusion, that portion of the decision was unanimous.

¶ 68    The second element is the court's statements of the issue presented in Pollock's challenge to the sufficiency of the evidence and its standard for reviewing that issue. The issue is stated as follows:

> "Defendant argues that the evidence, viewed with a correct understanding of the law of accountability, is insufficient to support her conviction for felony predicated on aggravated battery. In other words, defendant argues that the evidence presented at trial did not, and could not, establish that she knew Scott was abusing Jami and, accordingly, she did not possess the requisite intent to be held accountable for Scott's conduct which resulted in Jami's death." *Id.* at 217.

The standard of review is the one applicable to all criminal appeals challenging the sufficiency of the evidence. It states:

> "When reviewing the sufficiency of the evidence to sustain a verdict on appeal, the relevant inquiry is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.*

¶ 69    The third element is the test set out by the court for the evidence necessary to establish Pollock's accountability for murder:

> "Having concluded that there is no evidence to support a finding that defendant was present when the aggravated battery [by Scott] took place, the intent element necessary to establish defendant's accountability for murder must be founded on evidence that defendant *knew* that the principal (Scott) was abusing her child; that defendant *knew*, from the extent and severity of the injuries sustained by Jami, that there was a substantial risk of serious harm if defendant did nothing to protect her child from the principal (Scott); and *despite this knowledge*, continued to permit the principal (Scott) to have access and control over Jami." (Emphases added.) *Pollock*, 202 Ill. 2d at 219.

¶ 70    The fourth element is factual conclusions drawn after the court recited the incidents that the State claimed constituted abuse known to Pollock and before it announced its holding. Although not identifying them as findings, I would conclude that the court found the following facts to have been shown by the State's evidence:

> "First, there was no evidence that abuse by Scott was the cause of the bruises on Jami's head which were described as a 'headband.' Nor was there any evidence that Scott was in any way responsible for either of the falls Jami had. Scott's father testified at defendant's trial that he heard a noise and, upon investigation, found Jami at the foot of the stairs. Scott's father also testified, however, that he heard an upstairs door open and then saw Scott come to the top of the stairs to see what had happened. The fall, therefore, was simply a fall. It was not evidence of Jami's abuse by Scott.
>
> The same is true of the fall that resulted in Jami's receiving stitches. *** Dr. Parungao, who treated Jami for the injury, did not suspect that the injury was the result of abuse, rather than a fall, as reported. The State implies that, because Scott was caring for Jami when the falls occurred, they were evidence of his abuse. But to draw such a conclusion, one must resort to conjecture and speculation. ***
>
> *** Moreover, the injuries sustained by defendant's children were never so extensive or severe that defendant was put on notice that Scott posed a serious threat to her children. This was confirmed by the pathologist, who testified that all of Jami's

bruises which were not the result of injuries received in the minutes or hours prior to Jami's death, were not life threatening and could have been attributable to childhood injury. We also find it significant that, after Jami's death, defendant's other two children were examined by a doctor and, despite the fact that both children had some bruises, the doctor did not believe that the children showed signs of abuse.

The circumstances surrounding Jami's death do not suggest that defendant was aware of any foul play." *Id.* at 220-21.

¶ 71 The fifth element is the court's holding. After distinguishing the instant case from *People v. Stanciel*, 153 Ill. 2d 218 (1992), on which the State relied to support the giving of the challenged non-IPI instruction to the jury, the court held:

"In the case at bar, the evidence does not establish that defendant intended to promote or facilitate the aggravated battery which caused Jami's death. The evidence simply does not support the inference that Jami was the victim of an ongoing pattern of abuse that the mother knew about and sanctioned. *After reviewing all of the evidence presented at the defendant's trial in this case, we are convinced that no rational jury, given proper guidance regarding the law of accountability, could find beyond a reasonable doubt that defendant is accountable for the murder of her daughter, Jami.*" (Emphasis added.) *Pollock*, 202 Ill. 2d at 224.

¶ 72 The import of this holding is that evidence presented by the State did not, and could not, establish that Pollock (1) knew Scott English was abusing Jami; (2) knew from the extent and severity of any injuries sustained by Jami that there was a substantial risk of serious harm if defendant did nothing to protect her child from him; and (3) despite this knowledge, continued to permit him to have access and control over Jami. The evidence, therefore, failed to prove the intent element necessary to establish Pollock's accountability for murder.

¶ 73 For all of these reasons, I believe the court's decision demonstrates the petitioner is actually innocent of the crime with which she was charged. I understand that the majority does not share this belief, so I would also submit that the decision proves the second part of the third requirement for obtaining a certificate of innocence–which I would call legal innocence–and which the majority has neither cited nor considered.

"(3) the petitioner is innocent of the offenses charged in the indictment or information or his or her acts *or omissions charged in the indictment or information did not constitute a felony or misdemeanor against the State*[.]" (Emphasis added.) 735 ILCS 5/2-702(g)(3) (West 2008).

¶ 74 Inasmuch as the clear holding of the court in *Pollock* is that the State did not establish that the defendant had the intent necessary to prove accountability, it had failed to prove she was guilty of either aggravated battery or the felony murder for which the aggravated battery was the predicate offense. This holding satisfies the statutory definition for legal innocence set out above and the certificate of innocence should, therefore, issue.